710 So.2d 1054 (1998)
BRIER LAKE, INC.
v.
Herbert S. JONES.
No. 97-C-2413.
Supreme Court of Louisiana.
April 14, 1998.
Ernest S. Anderson, Anderson & Anderson, Slidell, for Applicant.
Leslie A. Lanusse, Howard R. Fussell, James T. Rogers, III, Adams & Reese, New Orleans, for Respondent.
VICTORY, Justice.[*]
We granted this writ primarily to determine whether a majority of lot owners in a subdivision may amend existing building restrictions to make them more restrictive. Because we hold that unanimous consent of all lot owners is required for such an amendment, we reverse that part of the judgment of the court of appeal which upheld the validity of such amendments.

*1055 FACTS AND PROCEDURAL HISTORY
On January 23, 1977, John Edward Chaignaud, the developer and then sole owner of all property in Brier Lake Estates, adopted and filed with the Clerk of Court of St. Tammany Parish "An Act of Dedication of Servitudes, Privileges and Restrictions Made by John Edward Chaignaud" (the "Original Restrictions"). The Original Restrictions were made applicable to separate "phases" of Brier Lake Estates as they were developed. On March 31, 1978, the Original Restrictions were filed and recorded and made applicable to Phase 4, which included Lots 115 through 130. The restrictions pertinent to this case involve fence height, carports, satellite dishes, assessments and attorneys' fees.
The Original Restrictions created an Environmental Control Committee and provided as follows:
Section 1. Environmental Control Committee. Except for development within the community of "Brier Lake" by the Developer, and except for any improvements to any lot or to the common areas by the Developer, no building, fence, wall, well, sewerage facility, culvert, or other improvements or structures shall be commenced, directed, placed, moved, altered or maintained upon the Property, nor shall any exterior addition to or change or other alteration thereupon be made until the complete plans and specifications, showing the location, nature shape, height, material, color, type of construction and/or any other proposed form of change (including, without limitation, any other information specified by the Board of Directors or by the Environmental Control Committee) shall have been submitted to and approved in writing as to safety, harmony of external design, color and location in relation to surrounding structures and topography by the Board of Directors of the Association, or by the Environmental Control Committee appointed by the Board of Directors. Subject to the same limitations as hereinabove provided for, it shall be prohibited to install, erect, attach, apply, nail, build, alter plant, remove or construct any lighting, shades, screens, awnings, patio covers, decorations, fences, hedges, landscaping features, walls, aerials, slabs, sidewalks, curbs, gutters, patios, balconies, porches, driveways, walls ... until the complete plans and specifications ... shall have been submitted to and approved in writing... by the Board of Directors of the Association or any committee designed by it.
Fences were specifically restricted as follows:
Section 1. Prohibited Uses and Nuisances. Except for the activities of the Developer, or except with the prior written approval of the Environmental Control Committee, or as may be necessary in connection with reasonable and necessary repairs or maintenance to any dwelling or upon the common areas:
(d) ... No fence or enclosure shall exceed 7 feet in height,....
Assessments were provided for as follows:
Section 1. Annual Assessments and Carrying Charges. Each person, group of persons, corporation, partnership, trust or other legal entity, or any combination thereof, who becomes a record owner of a lot, whether or not it shall be so expressed in the act of sale, contract to sell or other conveyance, shall be deemed to covenant and agree to pay the Association, in advance, a monthly sum (hereinelsewhere sometimes referred to as "assessments" or "carrying charges") equal to one-twelfth (1/12) of the member's proportionate share of the sum required by the Association, as estimated by its Board of Directors, to meet its annual expenses, including, but in no way limited to the following:
...
Section 4. Non-payment of Assessment. Any assessment levied pursuant to this Act of Dedication of any installment thereof, which is not paid within thirty (30) days after it is due, may, upon resolution of the Board of Directors, bear interest at the legal rate and the Association may bring an action of law against the member personally obligated to pay the same, in which event such interest, costs and reasonable attorneys' fees of not less than twenty percent (20%) of the sum claimed shall be *1056 added to the amount of the assessment. This shall be and remain a personal obligation of the member and shall not become a lien on the member's lot.
...
Section 7. Annual Membership Assessment. The maximum annual assessment for each of the lots to which Class A membership is appurtenant shall not exceed the sum of fifteen dollars ($15.00) per month or $180.00 per year.
Finally, the Original Restrictions provided for amendment or termination as follows:
Section 1. Duration  Amendment. Except where permanent servitudes or other permanent rights or interests are herein created, the servitudes, privileges and restrictions of this Act of Dedication shall run with and bind the land, and shall inure to the benefit of and be enforceable by the Association, or the owner of any lot subject to this Act of Dedication, their respective legal representatives, heirs, successors and assigns, for a term of thirty (30) years from the date of recordation of this Act of Dedication, after which said servitudes, privileges and restrictions shall be automatically extended for successive periods of ten (10) years each, unless an instrument signed by the then owners of a majority of the lots has been recorded, agreeing to change said servitudes, privileges and restrictions in whole or in part. The terms and provisions of this Act of Dedication, and any of the servitudes, privileges or restrictions herein contained, may be modified in whole or in part, terminated or waived, prior to or subsequent to the expiration of the thirty (30) year period aforesaid, by an Act of Modification, Termination or Waiver signed by the then owners of a majority of the lots and duly recorded with the Clerk of Court for St. Tammany Parish, Louisiana (emphasis added).
On December 13, 1983, a majority of the owners of the lots in Brier Lake Estates voted to amend the Original Restrictions and signed an "Amendment to Acts of Dedication of Servitude, Privileges and Restrictions for Additions 1 through 8, Inclusive, Brier Lake Estates," (the "Amended Restrictions"), which were filed for the record on January 5, 1984. The Amended Restrictions amended, consolidated and reinstated the various acts creating servitudes and restrictions in the Original Restrictions. While some of the servitudes and restrictions remained unchanged, several restrictions pertinent to this case were increased or added. Unless specifically noted below, the restrictions applicable to this case contained in the Amended Restrictions were the same as the Original Restriction provisions quoted above.
The Amended Restrictions continued the requirement that all plans, including plans for fences, garages and aerials, be submitted to the Environmental Control Committee for approval. However, the fence height restriction was increased to provide that "[n]o yard fences may exceed five (5) feet in height, but the Environmental Control Committee may approve a higher fence for special purposes."
The maximum amount of Assessments were increased to twenty dollars ($20.00) per month or $240.00 per year. Furthermore, in the event of nonpayment of Assessments, the amount of interest, costs and reasonable attorneys' fees claimable was increased to thirty-five percent (35%) of the amount due.
Lastly, a provision was added stating that "[a]ny interested person who successfully enforces in court any of the provisions hereof (except as set forth in Article V, Section 4) shall be entitled to recover reasonable attorney fees and all costs."[1]
Defendant, Herbert S. Jones ("Jones"), purchased Lot 124 in Brier Lake Estates on September 19, 1984. Although Jones was aware of the Original and Amended Restrictions, they were not specifically referred to in his deed and neither he nor his predecessor in title signed the Amended Restrictions. The cash deed provided only that the sale was "with all the buildings and improvements thereon, and all rights, ways, privileges, servitudes, appurtenances and advantages thereto belonging." Sometime between the fall of 1992 and early 1994, Jones constructed a six-foot fence, installed a television satellite *1057 dish and constructed a carport on his lot, all without submitting plans to the Environmental Control Committee for their approval. Further, Jones has failed to pay assessments since January 1, 1991.
Brier Lake instituted this action claiming that Jones' actions violated the Amended Restrictions and requesting that a mandatory injunction be issued requiring Jones to dismantle the fence and carport, and remove the television satellite dish and further enjoining him from building any other fence, carport or any other structure unless and until his plans and specification are submitted to and approved by the Environmental Control Committee. Brier Lake also requested an order compelling Jones to pay all outstanding dues and assessments together with reasonable attorneys' fees. In addition, Brier Lake sought reasonable attorneys' fees and costs incurred in bringing this action.
After a trial, the district court granted this relief and the First Circuit Court of Appeal affirmed. Brier Lake, Inc. v. Jones, 96-CA-0830 (La.App. 1st Cir. 7/23/97). We granted a writ to consider the correctness of the lower courts' rulings. Brier Lake, Inc. v. Jones, 97-C-2413 (La.12/19/97), 706 So.2d 439.

DISCUSSION

I. A General Overview of the Law of Building Restrictions
In 1977, the Louisiana Legislature repealed Title V of Book II of the Louisiana Civil Code governing the surveying of lands and the fixing of limits and enacted a new Title V regulating building restrictions. Thus, building restrictions are now defined and governed by Articles 775-783 of the Louisiana Civil Code. These articles generally codified the existing jurisprudence, because prior to 1977 the Code did not specifically deal with building restrictions.
Building restrictions are defined as "charges imposed by the owner of an immovable in pursuance of a general plan governing building standards, specified uses, and improvements. The plan must be feasible and capable of being preserved." La. C.C. art. 775. The comments to Article 775 describe building restrictions as "the most important category of restraints on the use or disposition of immovables from the viewpoints of urban and suburban developments in Louisiana." La. C.C. art. 775, comment (d). "The requirements of an ancestor in title and of a general development plan are essential features of building restrictions as sui generis real rights." Id.
Article 777 describes the nature and regulation of building restrictions as follows: "Building restrictions are incorporeal immovables and real rights likened to predial servitudes. They are regulated by application of the rules governing predial servitudes to the extent that their application is compatible with the nature of building restrictions." La. C.C. art. 777. Although the comments to this article state that the article codified existing jurisprudence, the jurisprudence prior to 1977 had inconsistently treated building restrictions as predial servitudes,[2] real obligations accompanying the land into the hands of the vendee,[3] or covenants or equitable restrictions running with the land.[4]
"Building restrictions may impose on owners of immovables affirmative duties that are reasonable for the maintenance of the general plan." La. C.C. art. 778. One such affirmative duty is the duty to pay assessments. Comment, Some Observations on Building Restrictions, 41 La. L.Rev. 1201, 1208 (1984); Yiannopolis, Predial Servitudes, § 196 at pp. 519-520 (2nd Ed.1997) ("Provisions that each *1058 purchaser of a lot in a subdivision shall automatically become a member of a corporation formed to provide maintenance of the common grounds, and that each member shall be subject to an annual assessment, have been enforced as reasonable and necessary.")
"Building restrictions may be enforced by mandatory and prohibitory injunctions without regard to the limitations of Article 3601 of the Code of Civil Procedure." La. C.C. art. 779. An injunctive action may be brought by the original subdivider or by landowners in the subdivision without the necessity of showing the ordinary prerequisites to injunctive relief, i.e., proof of irreparable injury, loss, or damage to the landowner. See Yiannopolis, Predial Servitudes, § 194 at 516-517 (2nd Ed.1997).
This Court has since consistently held that building restrictions "constitute real rights, not personal to the vendor, and inure to the benefit of all other grantees under a general plan of development, and are real rights running with the land; and that the remedy of the other grantees to prevent a violation of the restrictions by another is by injunction." Diefenthal v. Longue Vue Management Corp., 561 So.2d 44, 51 (La.1990); Cashio v. Shoriak, 481 So.2d 1013, 1015 (La. 1986); Oakbrook Civic Ass'n, Inc. v. Sonnier, 481 So.2d 1008, 1010 (1986).
The core issue in this case is the validity of the method by which Brier Lake Estates attempted to amend the Original Restrictions. The Amended Restrictions were adopted by a majority vote of the landowners in accordance with the amendment provisions of the Original Restrictions. While the Amended Restrictions restated many of the restrictions in the Original Restrictions, it increased some restrictions that already existed and added others. Defendant claims that although he had notice of the Amended Restrictions, the Amended Restrictions are invalid because they were not adopted by the unanimous consent of the landowners. This is an issue of first impression in this Court.
Article 776 provides the method by which building restrictions may be established as follows: "[b]uilding restrictions may be established only by juridical act executed by the owner of an immovable or by all the owners of the affected immovables." La. C.C. art. 776. There is no dispute that the building restrictions in the Original Restrictions were properly established by the developer of Brier Lake Estates as he was then the sole owner of all the property. Plaintiffs claim that Article 776 only applies to the original establishment of building restrictions and that under Article 780, the act establishing the original restrictions can provide a method for amendment of the restrictions that requires less than unanimous consent, even if the amended restrictions are more burdensome.
Article 780 entitled "Termination according to title; agreement of owners," provides as follows:
Building restrictions terminate as provided in the act that establishes them. In the absence of such provision, building restrictions may be amended or terminated for the whole or a part of the restricted area by agreement of owners representing more than one-half of the land area affected by the restrictions, excluding streets and street rights-of-way, if the restrictions have been in effect for at least fifteen years, or by agreement of both owners representing two-thirds of the land area affected and two-thirds of the owners of the land affected by the restrictions, excluding streets and street rights-of-way, if the restrictions have been in effect for more than ten years.
La. C.C. art. 780 (emphasis added).[5]
The comments to Article 780 state that "this provision reproduces the substance of R.S. 9:5622, repealed by Acts 1977, No. 170, *1059 § 8, effective January 1, 1978. It does not change the law." La. C.C. art. 780, comment (a). La. R.S. 9:5622 contained no provisions for amending building restrictions. Accordingly, when initially enacted in 1977, the second sentence of Article 780 read "[i]n the absence of such provision, owners representing more than one-half of the land area affected by the restriction may terminate by agreement ..." The 1980 amendment added "amend or" before terminate. Thus, before 1980, Article 780 and its predecessor, La. R.S. 9:5622, provided solely a method for terminating building restrictions by majority vote. In addition, the comments describe the article purely as a method of terminating existing building restrictions. No mention is made in the comments of amending building restrictions.
Brier Lake Estates argues that comment (a) supports its position because prior to 1977, this Court upheld provisions in an act establishing a restrictive covenant setting forth a procedure for the modification of the terms of the covenant by majority vote of the landowners. In Bruce v. Simonson Investments, Inc., supra, the landowners voted, by majority vote as provided for in the act establishing the building restrictions, to amend the building restrictions to allow certain residential areas to be used as parking areas. We held as follows:
The release of such a servitude is a real alienation. Normally, therefore, all owners of lots to which the servitude is due must give consent to achieve a full discharge of the servitude. The Act creating the servitude may, however, provide a different method of discharge or modification. The Act in the present case provided such a method. It required the affirmative vote in writing of the owners of a majority of the lots, after notice to all lot owners and a meeting. Such a provision is valid. (Emphasis added.)
207 So.2d at 363. However, since notice was not provided as required in the original act, we held that the modification was invalid. Id.
The crucial distinction between the instant case and Bruce is that in Bruce, the landowners were voting to lessen a building restriction to allow for a parking area. In effect, this is a termination of the residential use requirement for that area. Bruce does not hold that an act establishing a building restriction may contain a provision allowing for an amendment by majority vote which increases a restriction. Thus, contrary to Brier Lake's argument, it was not the law prior to 1977 to allow restrictions to be increased or added by less than unanimous consent.
In fact, while other courts have upheld amendments to building restrictions by majority vote, in each case the amendment lessened the restriction. See Perkins v. B & W Contractors, Inc., 439 So.2d 652 (La.App. 1st Cir.), writ denied, 443 So.2d 593 (La.1983) (amendment by majority vote allowing multifamily residences valid); Roccaforte v. Lewis, 286 So.2d 490 (La.App. 1st Cir.1973) (amendment by majority vote allowing apartment buildings valid); Failla v. Meaux, 237 So.2d 688 (La.App. 3rd Cir.1970) (amendment by majority vote allowing commercial usage valid). Because the amendments in these cases lessened rather than increased the restrictions, the holdings of these cases do not conflict with Article 776 which requires unanimous consent for the imposition of new building restrictions.
Civil Code articles 776 and 780 must be read in pari materia. La. C.C. art. 13. In addition, "[d]oubt as to the existence, validity, or extent of building restrictions is resolved in favor of the unrestricted use of the immovable." La. C.C. art. 783. Thus, we agree with the consensus among the legal commentators that amendments by a mere majority vote can only lessen existing building restrictions, but an "amendment" that creates more burdensome restrictions requires unanimous consent of all owners of the affected immovable property. See also Mackey v. Armstrong, 30,054-CA (La.App. 2nd Cir. 12/30/97), 705 So.2d 1198. For example, Professor Lee Hargrave has written:
To construe that reference to amendments as empowering the burdening of all lots in a subdivision with new restrictions upon approval of the owners of a only a simple majority of the land area affected would be to make a major change in the law on *1060 scant authority. There would seem to be little policy reason to move in that direction, policy being more generally toward free use of property and limiting private land use controls. It would be more consistent with that history and policy to construe Article 780 to refer only to amendments that lessen the restrictions on property.
Hargrave further writes:
If one were to allow new limitations by the amendment route, one would face further constitutional issues. Enforcement of private restrictions is considered state action that comes within the constitutional limitations. Louisiana constitution Article I, Section 4 would then come into play, with its provision that one's right to use and enjoy private property is subject to "reasonable statutory restrictions and the reasonable exercise of the police power."... That inquiry would then have to balance the extent of the deprivation of enjoyment with the reasons supporting the government interest in enforcing the limitation in favor of the neighbors. That latter inquiry would no doubt focus further on the reasonableness of the reasons the neighbors seek to impose the added restriction. The uncertainty and unpredictability of that approach would suggest that it ought not to be lightly undertaken. It would suggest that it is preferable to apply the statutory solution described above. If change is to be made, the legislature would be the more appropriate body to adopt the standards to apply....
Lee Hargrave, Property-Servitudes & Building Restrictions, 51 La. L.Rev. 371, 384-85 (1990). Professor Yiannopoulos expressed the same sentiment in his treatise on predial servitudes:
These clumsy amendments to Article 780 of the Louisiana Civil Code have confused the distinct and distinguishable matters of termination and amendment of building restrictions. An "amendment" of building restrictions may actually involve termination of existing restrictions, an imposition of new restrictions, or both. However, the requirements for the termination of building restrictions and for the termination of existing restrictions are not the same.
It has been correctly suggested that Article 780, as amended, contemplates amendments that lessen restrictions on property. When a purported amendment results in the imposition of new restrictions or in expansion of existing restrictions, all owners of the affected immovables must consent.
Yiannopolis, Predial Servitudes, § 196 at 522-523 (2 nd Ed.1997); see also Comment, Some Observations on Building Restrictions, 41 La. L.Rev. 1201, 1205 (1984) ("For modification of the plan which make it more restrictive, however, it arguably is necessary to obtain the consent of all owners, since the effect of tightening the existing restrictions is the same as creating new ones, and the creation of restrictions does require universal consent.")
Further, we are not persuaded by the argument that because Jones purchased the lot after the recordation of the Amended Restrictions, he must take the property subject to those restrictions. "Amended" building restrictions which increase restrictions or add new restrictions and which were not consented to by all the affected landowners in the subdivision are invalid. The recordation of invalid building restrictions does not give them validity.

II. Validity of the Applicable Restrictions in this Case
Because the Amended Restrictions contain a severability clause[6], we can presume that the Amended Restrictions would still have been adopted even without the provisions increasing or adding restrictions. Thus, the invalidity of certain provisions of the Amended Restrictions does not invalidate the Amended Restrictions in their entirety. The Amended Restrictions that are the same as the Original Restrictions are valid because these do not create "new" building restrictions. *1061 The provisions of the Amended Restrictions that contain "new" or "increased" restrictions are invalid because they were not established with the unanimous consent of the landowners.
Therefore, we now turn to whether the restrictions in the Amended Restrictions that Jones has violated are "new" or "increased" restrictions and thus invalid.

A. The Fence
Although Brier Lake Estates claims in its brief that Jones violated the provision in the Amended Restrictions that states that all plans for fences must be submitted to the Environmental Control Committee and that the same restriction existed in the Original Restrictions, another provision in the Amended Restrictions specifically governing fences is actually more restrictive than the specific reference to fences in the Original Restrictions. The Original Restrictions state that fences may be no more than seven (7) feet high, and Jones' fence meets that requirement. However, the Amended Restrictions state that except for "special use" fences, fences can be no higher than five (5) feet. Jones' fence is clearly not a "special use" fence, thus his fence violates this "increased" requirement.[7] Because this restriction regarding fence height was "increased" without the unanimous consent of the landowners under Article 780, it is invalid. Thus, Jones should not have been ordered to remove his fence.

B. The Carport
Brier Lake claims that Jones violated the Amended Restrictions' provision requiring that all plans for carports be submitted to the Environmental Control Committee for approval. As stated above, this same requirement existed in the Original Restrictions. We have found no more burdensome or new restriction in the Amended Restrictions regarding carports that Jones has allegedly violated. Thus, because the restrictions in the Amended Restrictions were not increased, they are valid. The lower courts were correct in ordering Jones to remove his carport.

C. The Satellite Dish
There are likewise no increased or new restrictions in the Amended Restrictions regulating satellite dishes. Brier Lake claims that both the Amended Restrictions and the Original Restrictions require submission of plans to build satellite dishes as satellite dishes are "aerials." We find that the lower courts were not manifestly erroneous in finding that Jones violated the Amended Restrictions by failing to have his plans for a satellite dish approved. Thus, the lower courts were correct in ordering Jones to remove the satellite dish.

D. Attorneys' Fees
The trial court ordered Jones to pay $20,000 in attorneys' fees as required by the new provision in the Amended Restrictions providing that "[a]ny interested person who successfully enforces in court any of the provisions hereof (except as set forth in Article V, Section 4) shall be entitled to recover reasonable attorney fees and all costs." The court of appeal found this amount to be excessive and reduced the award to $15,000. The court of appeal also awarded an additional $1,500 for legal fees incurred by Brier Lake in connection with the appeal.
This provision in the Amended Restrictions is entirely new as there was absolutely no provision in the Original Restrictions allowing the recovery of attorneys' fees. Thus, this "new" provision is invalid because it was not adopted with the unanimous consent of all landowners under Article 780. Furthermore, attorneys' fees are not allowed in Louisiana except where authorized by statute or contract. Quealy v. Paine, Webber, Jackson & Curtis, Inc., 475 So.2d 756, 763 (La.1985). As no statute or other contract authorizes the recovery of attorneys' fees, Jones is not liable for these attorneys' fees.

*1062 E. The Assessments

Jones has not paid assessments since January of 1991. This suit was filed on May 4, 1993. The Amended Restrictions increased the maximum amount of assessments due and increased the amount of interest, attorneys' fees and costs. In its First Supplemental and Amending Petition filed on April 14, 1994, Brier Lake Estates alleged that Jones owes $1,086.00 in assessments due from January 1, 1991, plus thirty-five percent (35%) of that amount for reasonable attorneys' fees based on the Amended Restrictions.
Jones claims that assessments are building restrictions and subject to the two-year prescriptive period of Article 781. Thus, he alleges that the petition for collection of any dues and assessments that have accrued for more than two years prior to the filing of the plaintiff's suit are perempted. The court of appeal found that assessments are a personal obligation and thus subject to the ten-year prescriptive period of Article 3499 relying on Mariner's Village Master Ass'n, Inc. v. Continental Properties, 93-1530 (La.App. 1st Cir. 5/20/94), 639 So.2d 1188 and Village Square Shopping Center Ass'n v. Nelson, 522 So.2d 163 (La.App. 4th Cir.), writ denied, 526 So.2d 793 (1988).
In Mariner's Village, certain individuals purchased property in which the Act of Sale specifically acknowledged the recorded building restrictions applicable to the property. These building restrictions included the duty to pay assessments. These individuals then sold the property to other individuals who, by counter-letter, stated that the property was purchased for the account of a partnership of which the buyers were the general partners. The partnership refused to pay assessments claiming that the partnership was not a member of the association. The appellate court concluded that "by purchasing Parcel J-1 subject to the Master Deed [containing the building restrictions] defendants bound themselves personally for the assessments." (639 So.2d 1188, 1196).
In Village Square, the court found that the "[p]roperty in the subdivision was sold subject to building restrictions which included provisions for the Association to assess...." 522 So.2d 163, 164. There is no indication that these were not valid building restrictions. The court "pretermitted the question of whether the provisions in the restrictions for the assessments is a building restriction," and found the obligation to pay assessments to be a personal obligation with a ten year prescriptive period as a matter of contract law. Id. at 168.
There is no doubt that Jones has an obligation to pay assessments as such assessments were provided for in the Original Restrictions signed by the developer of Brier Lake Estates. As stated earlier, "[p]rovisions that each purchaser of a lot in a subdivision shall automatically become a member of a corporation formed to provide maintenance of the common grounds, and that each member shall be subject to an annual assessment, have been enforced as reasonable and necessary." Yiannopolis, Predial Servitudes, § 196 at pp. 519-520 (2nd> Ed.1997). In addition, the duty to pay assessments has been characterized as an affirmative duty that may be imposed by a building restriction. Comment, Some Observations on Building Restrictions, 41 La. L.Rev. 1201, 1208 (1984). This obligation has also been recognized by the legislature in La. R.S. 9:1145 which establishes a procedure for recording a privilege on the immovable for which assessments are delinquent.[8]
However, Jones' obligation cannot be classified as a personal obligation. See Tall Timbers Owners' Ass'n v. Merritt, 376 So.2d 586 (La.App. 4th Cir.1979) (obligation to pay assessments is a real obligation); see also La. C.C. art. 1764[9]; Yiannopolis, The Work *1063 of the Louisiana Appellate Courts for the 1975-1976 Term-Property, 37 La. L.Rev. 317, 329-330 (1977) (questioning whether the duty to pay assessments can be classified as a personal obligation without an express stipulation to that effect).
Jones' property was, by virtue of the recordation of the validly enacted Original Restrictions, subject to the Original Restrictions requiring the affirmative duty of paying assessments, not to exceed $180.00 per year. We hold that this obligation is properly characterized as a building restriction and is subject to the two-year prescriptive period of La. C.C. art. 775 and is not a personal obligation under La. C.C. art. 3499. To the extent that Mariner's Village, supra, and Village Square, supra, held otherwise, they are overruled. Thus, Jones is not obligated to pay assessments that were due over two years when suit was filed.
Brier Lake Estates filed suit on May 4, 1993, claiming assessments due since January 1, 1991. The assessments due from January 1, 1991, through May 1, 1991, are prescribed. Thus, Brier Lake Estates is entitled to assessments due from May 4, 1991 through June of 1995, at the rate of fifteen dollars ($15.00) per month, plus interest and costs, and twenty percent (20%) reasonable attorneys' fees.[10] We calculate that amount to be $735.00, plus interest, costs and twenty percent (20%) attorneys' fees.

CONCLUSION
A majority of lot owners in a subdivision may not "amend" existing, valid building restrictions to make them more burdensome or restrictive. Such an "amendment" or "modification" is in reality the creation of a new building restriction for which unanimous consent of all landowners in the subdivision is required under Article 776. Furthermore, the obligation to pay assessments, where created solely through a building restriction, is not a personal obligation under Article 3499, but is governed by the two-year prescriptive period of Article 781.

DECREE
For the reasons stated herein, the judgment of the court of appeal ordering defendant to remove his carport and satellite dish is affirmed. The judgment of the court of appeal ordering defendant to remove his fence and to pay attorneys' fees in the amount of $16,500.00 is reversed. The judgment of the court of appeal ordering defendant to pay $1,831.45 in assessments plus thirty-five percent (35%) of that amount in interest, costs and attorneys' fees is reduced to $735.00, plus interest, costs and twenty percent (20%) attorneys' fees.
AFFIRMED IN PART, REVERSED IN PART.
KNOLL, J., dissents and assigns reasons.
JOHNSON, J., dissents.
KNOLL, Justice, dissenting.
I disagree with the holding of the majority opinion that the lot owners in a subdivision may not modify existing valid building restrictions in accordance with the amendment provisions found in the restrictions themselves. I further disagree that any modification making an existing restriction more onerous is identical to establishing a new building restriction.
A simple reading La.Civ.Code art. 780 provides authorization for the amendment or termination of existing building restrictions, when such amendment is enacted in accordance with the act establishing the restrictions. In the case sub judice, the act creating the building restrictions plainly provided that the restrictions could be modified by a majority of the lot owners. The modifications to the restrictions were reasonable and were calculated to maintain the character and nature of the subdivision in the same manner as the original restrictions.
*1064 The majority distinguishes the instant case because the amended restrictions were more onerous to the defendant than the original restrictions. Ostensibly, the majority's reasoning is that because the imposition of more onerous restrictions is an additional abrogation of the property rights of all the owners, then all the owners must consent to amendment. I find that this is not a valid point of distinction. In my view, the lessening or termination of building restrictions is also an abrogation of the real rights of all the owners. As noted in the majority opinion at 1059, in Bruce v. Simonson Investments, Inc., 251 La. 893, 207 So.2d 360 (1968) this Court stated:
The release of such a servitude is a real alienation. Normally, therefore, all owners of lots to which the servitude is due must give consent to achieve a full discharge of the servitude. The Act creating the servitude may, however, provide a different method of discharge or modification.
Bruce, supra at 363.
I disagree with the majority's finding that any modification which makes a building restriction more onerous is identical to the enactment of a wholly new restriction. Clearly, the amendment to the fence restriction changing the fence height from seven to five feet is merely a modification of the existing restriction rather than the establishment of a new and overlapping restriction. Likewise, the increase in the monthly assessment from fifteen dollars to twenty dollars is merely a modification of the existing assessment provision rather than the establishment of a wholly new assessment. This is not an instance of a neighborhood establishing a system of restrictions where none had existed before. The instant case merely concerns minor modifications made to an already functioning set of restrictive covenants. The majority opinion hamstrings the ability of neighborhood associations to adapt to the inevitable changes that time will bring. This is especially evident in its prohibition of future assessment increases, since inflationary pressures will gradually erode the neighborhood association's financial ability to preserve the character of the neighborhood through maintenance of common areas.
While the majority opinion is based on the policies of free use of land and limiting private land controls, I find that equally important policies have been overlooked. An increasing number of people in this state now choose to reside in developments which are governed by restrictive covenants such as the ones at issue in the case sub judice. Those residents who have chosen to live in these developments have a reasonable expectation that the building restrictions will be enforceable to maintain the essential character of the community for the benefit of all residents. In my view, the residents also have a reasonable expectation that the building restrictions may be modified in order to address conditions which may affect the community in the future. These modifications may be more or less onerous to the individual landowner, as long as they are reasonably necessary for the preservation of the character of the community. In this way, the amendments are simply a furtherance of the objectives of the original restrictions. See Zito v. Gerken, 225 Ill.App.3d 79, 167 Ill.Dec. 433, 587 N.E.2d 1048 (1993); Harrison v. Air Park Estates Zoning Committee, 533 S.W.2d 108 (Tex.Civ.App.1976); McMillan v. Iserman, 120 Mich.App. 785, 327 N.W.2d 559 (1982).
Correlative to the reasonable expectation that the restrictions will be enforced is the property owner's knowledge that the building restriction infringes his or her individual rights of free use of the property. In the instant case, the defendant was well aware of the building restrictions, both original and as amended. In fact, defendant had served on the Board of Directors of Brier Lake and had enforced the restrictions on other lot owners. I would find that defendant's purchase of a Brier Lake lot with clear knowledge of the amendment provisions of the original restrictions operated as a tacit waiver of his individual rights as a property owner. In short, by becoming a member of the Brier Lake community, defendant agreed to balance his individual rights against the community's needs as determined by a majority of its members.
The acrimonious circumstances of the instant case clearly illustrate the reason for allowing amendment by a majority vote. By *1065 allowing a single dissenter to prevent any amendment of the restrictions determined to be "more onerous," the majority has effectively eliminated the ability of neighborhood associations to adapt to changing conditions, and it has virtually guaranteed a slow financial death for these organizations. For the foregoing reasons, I respectfully dissent.
NOTES
[*] Calogero, C.J., not on panel. Rule IV, Part 2, § 3.
[1] Article V, Section 4 is the section dealing with nonpayment of assessments.
[2] Bruce v. Simonson Investments, Inc., 251 La. 893, 900, 207 So.2d 360, 363 (1968); McGuffy v. Weil, 240 La. 758, 764, 125 So.2d 154, 157 (1960); Camelot Citizens Ass'n v. Stevens, 329 So.2d 847, 849 (La.App. 1st Cir.), writ denied, 333 So.2d 242 (La.1976); Robinson v. Morris, 272 So.2d 444, 447 (La.App. 2nd Cir.1973).
[3] Salerno v. DeLucca, 211 La. 659, 665-666, 30 So.2d 678, 679-680 (1947); Queensborough Land Co. v. Cazeaux, 136 La. 724, 730-31, 67 So. 641, 643-644 (1915); Tucker v. Woodside, 53 So.2d 503, 507 (La.App. 1st Cir.1951); but see Cambais v. Douglas, 167 La. 791, 794-795, 120 So. 369, 371 (1929).
[4] Hill v. William P. Ross, Inc., 166 La. 581, 117 So. 725 (1928).
[5] The Civil Code provides two other methods for the termination for building restrictions: prescription and abandonment. Article 781 provides that no action for injunction or damages may be brought after two years from the commencement of a noticeable violation of a building restriction. Thus, "[a]fter the lapse of this period, the immovable on which the violation occurred is freed of the restriction that has been violated." La. C.C. art. 781. Article 782 provides that building restrictions terminate by abandonment of the whole plan or by a general abandonment of a particular restriction.
[6] Section 5. Severability. Invalidation of any one of these servitudes, privileges or restrictions by judgment, decree or order shall in no way affect any other provisions hereof, each of which shall remain in full force and effect.
[7] Although Brier Lakes argues that defendant's fence was in violation of the Amended Restrictions because plans for the fence were not submitted to the Environmental Control Committee for its approval, there is no indication or assertion that the fence was inappropriate for any reason other than its height.
[8] Although Brier Lake Estates agreed not to do so in the section of the Original and Amended Restrictions dealing with non-payment of assessments, La. R.S. 9:1145-1147 gives the plaintiff the right to lien the property.
[9] Article 1764. Effects of Real Obligation.

A real obligation is transferred to the universal or particular successor who acquires the movable or immovable thing to which the obligation is attached, without a special provision to that effect.
But a particular successor is not personally bound, unless he assumes the personal obligations of his transferor with respect to the thing, and he may liberate himself of the real obligation by abandoning the thing.
[10] Jones is not obligated to pay assessments based on the Amended Restrictions as ordered by the lower courts because those restrictions increased the amount owed without a majority vote of the owners.