MAX N. TOBIAS, JR., Judge.
| Mean Laforge, wife oí/and Jay Michael Napolitano (collectively hereinafter, “the Napolitanos”), the plaintiffs/appellants, appeal the judgment denying their request for a permanent injunction against defendants/appellees, BellSouth Telecommunications, Inc. (“BellSouth”) and the State of Louisiana, through the Division of Administration, in its capacity as successor to the Board of Commissioners of the Orleans Levee District (“OLD”).[1] After reviewing the record and applicable law, we affirm the judgment of the trial court.
At issue in this case is BellSouth’s construction of a cabinet — a telecommunications network facility — in Floral Park, one of the interior parks in the Lake-Vista Subdivision.[2] Floral Park is owned by OLD, a state agency and is state land.[3]
LWhen the Lake-Vista Subdivision was created in 1947, the state and the neighborhood homeowners association entered into a covenant that mandated that all telecommunication equipment be located underground and not within sight. Residents of the neighborhood are required to agree to be subject to strict building restrictions that, among other things, governed the height of homes, the square footage of homes, and any fencing the residents may have desired.
All building plans were required to be submitted to the state, through OLD, for approval prior to commencing construction. OLD enforced the provisions of the building restrictions, and made sure that all construction was in compliance with restrictions.
The Napolitanos appreciated the unobstructed green space offered by Floral Park and protected by the Lake-Vista *1185 Subdivision Building Restrictions. When a property lot along Floral Park became available, the Napolitanos bid on the property, and the bid was accepted by OLD. The property, Lot 36-C, was conveyed by OLD to the Napolitanos on 10 October 2003.
The act of cash sale made reference to the Lake-Vista East Subdivision building restrictions and a copy of the Building Restrictions was attached to the act of sale. The act of sale conveyed to the Napolitanos “all the rights, ways, privileges, servitudes, advantages, etc. thereunto belonging or in anywise appertaining” to the property as described therein. That act of sale, together with the survey and the building restrictions, were registered in the Office of the Orleans Parish Register of Conveyances on 22 October 2003.
|sThe Napolitanos hired an architect to design the plans and specifications for the house they desired to have constructed. The view of Floral Park, adjacent to the lot, was an attractive view from the property. Accordingly, the house was designed so that the den, master bedroom, study, and back porch were on the Floral Park side of the house.
After the plans and specifications were completed, the plans were first submitted to the OLD Engineering Department for approval. The plans were revised several times to meet the specifications and requirements of the OLD and conform to the neighborhood’s building restrictions.
On 20 January 2005, the Chief Engineer of the OLD stamped his approval on the plans for the construction of the home. A letter of “no objection” was issued and sent to Mr. Napolitano on that date by Stephen G. Spencer, P.E., Chief Engineer of the OLD. Thereafter, the plans were submitted to the Lake Vista Property Owners Association Incorporated for its approval, which was a condition precedent before obtaining a building permit. The plans were approved by the neighborhood building association and thereafter the plans and specifications were taken to the New Orleans Department of Safety and Permits for issuance of a building permit. On 16 February 2005, the department issued a building permit for the construction of a two-story family residence at 114 Lark Street, the municipal address for Lot 36-C.
Construction of their home began in March 2005. By the end of August 2005, when Hurricane Katrina approached the city of New Orleans, the house had |4been framed, the windows and doors had been hung, sheeting had been installed upon the exterior walls of the house, and the roof had been covered with roofing felt, thus completely sealing the interior of the house from ordinary water intrusion. The Napolitanos thereafter evacuated to Florida and did not return to New Orleans until June of 2006, although Mr. Napolitano made visits to the city, partially to check on the house.
Hurricane Katrina destroyed much of the city’s critical infrastructure, including, but not limited to vital telecommunications services. Particularly, BellSouth’s 1976 telecommunications structure, which provided telecommunications services to the Lake-Vista Subdivision and surrounding neighborhoods, was ruined by flood waters. As such, it was necessary for Bell-South to construct and install the cabinet in Floral Park in order to restore and maintain telephone and other telecommunications services in the Lake-Vista Subdivision in the aftermath of Hurricane Katrina.
The cabinet houses the wires, fiber optic cables, and other electronic equipment necessary to transmit voice, data, and video. Additionally, the cabinet provides tele *1186 phone, internet, and similar telecommunications services to BellSouth’s customers in the Lake-Vista Subdivision and to customers of other telecommunications providers who provide service over Bell-South’s transmission network.
Prior to Hurricane Katrina, BellSouth provided its telecommunications network services through large buried copper trunk cables that were interconnected |Rto the wires serving individual residences and buildings. Even though the cables were buried below ground, the interconnection between the trunk cables and the wires to individual homes occurred in facilities called “cabinets” and/or “cross boxes” that were located above-ground. Since 1976, BellSouth had one of its aboveground cross boxes in Floral Park, immediately adjacent to the current telecommunications network facility at issue in this litigation, the cabinet.[4]
Because the flood waters destroyed Bell-South’s 1976 copper-wire based cross box, BellSouth decided to upgrade its network to fiber-optic cables in order to safeguard against wind, water, and flooding associated with future tropical storms or hurricanes. Given that fiber optic cables were involved, and building codes required new structures to be elevated (in a post-Katrina era), BellSouth’s new telecommunications network facility, the cabinet, had to be larger than the cross box that it replaced. Like the 1976 cross box, the cabinet would serve as the central interconnection point between the network of underground cables and wires to individual houses. As such, it had to be located where the cables and wires came together. After investigating several locations, it was decided that the best location was immediately adjacent to BellSouth’s damaged 1976 cross box in | ^Floral Park; the site was already an established interconnection point where the cables and wires converged.
Because OLD owned Floral Park, Gary Majors, BellSouth’s right-of-way agent, sought a 30 by 30 feet servitude from OLD granting BellSouth permission to construct and install the cabinet in Floral Park where it currently sits. In connection with its request for a servitude, BellSouth explained to OLD exactly what it intended to construct upon that servitude.
Mr. Majors conducted a title search of the public records of the Orleans Parish Conveyance Office, temporarily relocated to the Ernest N. Morial Convention Center due to Hurricane Katrina flood waters, for any encumbrances at the desired Floral Park location. Many of the conveyance records were flooded and others were being shipped to a depository in Maryland to be dried and restored. As such, the public records available at the Convention Center were sparse and often hard to locate. Mr. Majors found no encumbrances on the desired Floral Park location.
In its November meeting, OLD Planning, Engineering and Construction Committee discussed and recommended a servitude at “101 Lark Street.” Later, in follow up, OLD’s Board of Commissioners *1187 issued a resolution granting a servitude to BellSouth at “111 Lark Street.” At no time during any of OLD committee or board meetings did anyone mention that BellSouth actually wanted a servitude on a plot of land “opposite” the municipal address of 111 Lark Street, which would 17place the servitude in the middle of Floral Park. However, the parties understood that the cabinet would be placed at, or near, the location of the previous cross box.
At the 21 December 2005 OLD board meeting, a BellSouth representative presented the servitude documents for 111 Lark Street, New Orleans, which was executed by one of the authorized OLD representatives. An inspection of the records in the conveyance office revealed that the actual servitude granted was on land “opposite 111 Lark Street.” The representatives of BellSouth did not know about the Lake-Vista Building Restrictions so they were not taken into consideration. They were never mentioned by OLD.
BellSouth paid OLD $25,000 for the servitude. The servitude granted does not reference any Lake-Vista Building Restrictions or other encumbrances, and nothing in the servitude limits BellSouth’s ability to elevate the cabinet to protect its fiber optics from water damage.
In February 2006, BellSouth commenced work at the site in Floral Park to prepare to place the cabinet. By late May 2006, the cabinet was completed, and in place in Floral Park. When the Napolita-nos returned to their home after Hurricane Katrina, they found the cabinet built 53 feet from their property line.
BellSouth was intending to landscape around the cabinet, but before it could do so, the Napolitanos filed suit seeking a permanent injunction and obtained a preliminary injunction which directed that:
The status quo of the parties remains the same until a trial on the permanent mandatory and prohibitory injunction is heard before this Court.
|sThe Napolitanos filed suit against OLD and BellSouth, seeking a permanent injunction to void the servitude, removal of the cabinet, damages for trespass, mental anguish and inconvenience, and attorney’s fees.
A trial on the merits was held on 6 July 2011. The trial court rendered judgment in favor of OLD and BellSouth, denying the Napolitanos, request for injunctive relief and damages. In written reasons for judgment, the court reasoned:
Over a century ago, in State et al. v. Cumberland Telephone and Telegraph Co., [52 La.Ann. 1411], 27 So. 795 (La.1899), the Louisiana Supreme Court held that a telephone company can utilize rights of way over state lands without paying compensation. The Court based its decision on St. 1880, No. 124, a direct predecessor of La. R.S. 45:781. By its plain language the statute gives “[s]uch companies shall be entitled to the right of way over all lands belonging to the state.” This holding has never been overturned, and indeed, was reaffirmed by the Fourth Circuit in State Through Div. of Admin., State Land Office v. South Cent. Bell Telephone Co., 619 So.2d 749 [ (La.App. 4th Cir.1993).]
Addressing the plaintiffs’ argument that the right granted by La. R.S. 45:781 is subject to the subsequently adopted Lake-Vista Building Restrictions and servitudes, and that all owners in Lake-Vista should be compensated, the trial court stated,
The Court holds that [BellSouth’s] right came into being when the statute was passed. Arguing otherwise would imply that the right came into existence when BellSouth attempted to exercise it, which would lead to absurd results. For *1188 example a community that wished to eschew technology altogether could pass a building restriction forbidding all telephone lines whatsoever. Such subsequent building restrictions cannot trump the statute itself, nor make it so onerous as to be impractical. In the instant case, if BellSouth is subject to the building restrictions, then it must attempt to obtain consent from and make just compensation therefore from every resident of Lake Vista subdivision, even those who cannot see the control box, or are otherwise unaware of its existence.
|flThis seems to be the exact opposite of the intent of the 1880 statute and La. R.S. 45:781, which is to make it easier for companies that are in the business of “transmitting intelligence” to provide their services to residents of the state. Making BellSouth subject to building restrictions put into place after the statute leads to an absurd result; BellSouth must partake of extremely time consuming and (potentially) expensive negotiations with hundreds of people, many of which are not in proximity to (or even aware of) the control box.
The Court finds that the intent behind the statute is that once the right comes into existence, it cannot be bound by a subsequent servitude or building restriction, even if the right of way is not exercised until after such servitudes came into existence.
Consequently, the trial court denied the relief sought by the Napolitanos and this timely appeal followed.
The Napolitanos have assigned eight errors for review:
1.The trial court erred as a matter of law in ruling that La. R.S. 45:781, which provides telecommunication companies the right to use certain public property, applies to any and all state land, wherever located, whereas the statute clearly limits such use only to state property which is located along public roads or public works, or parallel to any railroads in the state, or along and over the waters of the state.
2. The trial court erred as a matter of law ruling that upon the passage of St. 1880, No. 124, the direct predecessor of La. R.S. 45:781, BellSouth was automatically vested with property rights on all land owned by the state, which preempts any servitudes that came into being after the year 1880, regardless of when BellSouth decides to exercise their rights to request and purchase servi-tudes in order to construct telephone lines.
3. The trial court erred as a matter of law in holding that BellSouth is allowed to construct telephone lines in violation of servitudes of other persons without having secured such right by consent, contract, or agreement of such other persons, or in its absence, by legal expropriation proceedings.
|104. The trial court erred as a matter of law in not granting Napolitanos’ injunction for removal of the offending structure.
5. The trial court erred as a matter of law in holding that the transaction between OLD and BellSouth conveying the servitude was a valid transaction.
6. The trial court erred as a matter of law in failing to find that OLD breached its duty to the Napolitanos to enforce the building restrictions which prohibited the placement of anything within Floral Park and requiring BellSouth to submit construction plans in compliance with the building restrictions.
7. The trial court erred as a matter of law in not allowing into evidence the Napolitanos’ proof of attorney’s fees incurred in the prosecution of the claim.
*1189 8. The trial court erred as a matter of law in not awarding damages for trespass, mental anguish, inconvenience and attorney’s fees.
The first issue before us is the correct interpretation of La. R.S. 45:781. Because this matter involves the interpretation of a statute, a question of law, it is reviewed under a de novo standard. Thibodeaux v. Donnell, 08-2486, p. 3 (La.5/5/09), 9 So.3d 120, 122. However, this case also involves factual determinations made by the court below; these are subject to review for manifest error. Rando v. Anco Insulations Inc., 08-1163, p. 29 (La.5/22/09), 16 So.3d 1065, 1087.
We begin with our analysis of La. R.S. 45:781, that states in pertinent part:
Corporations, domestic or foreign, formed for the purpose of transmitting intelligence by telegraph or telephone or other system of transmitting intelligence, may construct and maintain telegraph, telephone or other lines necessary to transmit intelligence along all public roads or public works, and along and parallel to any of the railroads in the state, and along and over the waters of the state, if the ordinary use of the roads, works, railroads, and waters are not obstructed, and along the |n streets of any city, with the consent of the city council or trustees. Such companies shall be entitled to the right of way over all lands belonging to the state and over the lands, privileges and ser-vitudes of other persons, and to the right to erect poles, piers, abutments, and other works necessary for constructing and maintaining lines and works, upon making just compensation therefor. If the company fails to secure such right by consent, contract or agreement upon just and reasonable terms, then the company has the right to proceed to expropriate as provided by law for railroads and other works of public utility, but shall not impede the full use of the highways, navigable waters, or the drainage or natural servi-tudes of the land over which the right of way may be exercised. [Emphasis supplied.]
As stated in Sensebe v. Canal Indemnity Co., 10-0703, pp. 8-9 (La.1/28/11), 58 So.3d 441, 447:
The starting point in the interpretation of any statute is the language of the statute itself. Words and phrases shall be read in context and shall be construed according to the common and approved usage of the language. La. R.S. 1:3. The meaning and intent of a law is determined by considering the law in its entirety and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting the law.
We do not interpret the statute as urged by the Napolitanos. While companies “formed for the purpose of transmitting intelligence by telegraph or telephone or other system of transmitting intelligence” may construct its lines along the public roads, works, railroads, and waters of the state, their rights go further. These companies are also entitled to a right of way “over all lands belonging to the state and over the lands, privileges and servitudes of other persons.” This right of way in the second sentence of the statute is far broader than the right of way described in the first sentence.
It is undisputed that Floral Park is owned by OLD and hence the state. The issue thus is whether the building restrictions create a privilege and/or predial | ^servitude in favor of the Napolitanos, thereby requiring BellSouth to pay just *1190 compensation. The Napolitanos argue that the building restrictions do just that.
In Brier Lake, Inc. v. Jones, 97-2413, pp. 6-8 (La.4/14/98), 710 So.2d 1054, 1057-58, the Court addressed the issue of predial servitudes and building restrictions as follows:
In 1977, the Louisiana Legislature repealed Title V of Book II of the Louisiana Civil Code governing the surveying of lands and the fixing of limits and enacted a new Title V regulating building restrictions. Thus, building restrictions are now defined and governed by Articles 775-783 of the Louisiana Civil Code. These articles generally codified the existing jurisprudence, because prior to 1977 the Code did not specifically deal with building restrictions.
Building restrictions are defined as “charges imposed by the owner of an immovable in pursuance of a general plan governing building standards, specified uses, and improvements. The plan must be feasible and capable of being preserved.” La. C.C. art. 775. The comments to Article 775 describe building restrictions as “the most important category of restraints on the use or disposition of immovables from the viewpoints of urban and suburban developments in Louisiana.” La. C.C. art. 775, comment (d). “The requirements of an ancestor in title and of a general development plan are essential features of building restrictions as sui generis real rights.” Id.
Article 777 describes the nature and regulation of building restrictions as follows: “Building restrictions are incorporeal immovables and real rights likened to predial servitudes. They are regulated by application of the rules governing predial servitudes to the extent that their application is compatible with the nature of building restrictions.” La. C.C. art. 777. Although the comments to this article state that the article codified existing jurisprudence, the jurisprudence prior to 1977 had inconsistently treated building restrictions as predial servitudes, real obligations accompanying the land into the hands of the vend-ee, or covenants or equitable restrictions running with the land.
[[Image here]]
| rsThis Court has since consistently held that building restrictions “constitute real rights, not personal to the vendor, and inure to the benefit of all other grantees under a general plan of development, and are real rights running with the land; and that the remedy of the other grantees to prevent a violation of the restrictions by another is by injunction.” Diefenthal v. Longue Vue Management Corp., 561 So.2d 44, 51 (La.1990); Cashio v. Shoriak, 481 So.2d 1013, 1015 (La.1986); Oakbrook Civic Ass’n, Inc. v. Sonnier, 481 So.2d 1008, 1010 (1986).[5]
In Diefenthal v. Longue Vue Foundation, 02-1470, pp. 18-19 (La.App. 4 Cir. 1/7/04), 865 So.2d 863, 875-76, we also examined the nature of building restrictions and their relationship to predial ser-vitudes:
*1191 Although building restrictions and predial servitudes are alike in that they both create real rights, these two concepts are different in at least three respects; to wit: (i) building restrictions may be imposed in the absence of a dominant estate, predial servitudes may not; (ii) building restrictions may impose affirmative duties that are reasonable and necessary for the maintenance of the general plan, predial servitudes may not; and (iii) building restrictions may exclude performance of certain juridical acts, predial servitudes may not. Patrick Johnson, Jr., Comment, The Civil Code Articles on Building Restrictions: A Cntical Analysis, 53 Tul. L.Rev. 588, 590 (1979).
Since the rules governing building restrictions are different from those governing predial servitudes, a classification issue is presented as to the precise nature of the rights created when restrictions are imposed by agreement among all the landowners. See La. C.C. art. 776 (providing that a building restriction may be imposed either by the owner of an immovable — i.e., the original developer — before the property is subdivided, or by all the owners of the affected immovable after the property is subdivided). The resolution of the classification issue h/⅛ a matter of contractual interpretation, resolved in the light of the facts of each case and in accordance with the intention of the parties.” La. C.C. art. 776, Comment (b). When there is any doubt as to the existence, validity, or extent of building restrictions, Article 783 requires that the matter be resolved in favor of unrestricted use of the immovable.
Later that same year, our brethren on the Second Circuit Court of Appeal, in Tri-State Sand & Gravel, L.L.C. v. Cox, 38,217, pp. 4-5 (La.App. 2 Cir. 4/7/04), 871 So.2d 1253,1256, came to the same conclusion:
Defendant argues that the real rights sought to be enforced by Tri-State are reciprocal predial servitudes. Defendant’s assertion is misplaced. Building restrictions are incorporeal immovables and real rights merely likened to predial servitudes. In addition, building restrictions are regulated by applying the rules governing predial servitudes to the extent that these rules are compatible with the nature of building restrictions. See, La. C.C. art. 777. Comment (d) to Article 777 notes that as sui generis real rights “akin” to predial servitudes, building restrictions are regulated by the “general rules applicable to predial servitudes, subject to certain modifications concerning the ... enforcement ... of building restrictions.”
Unlike predial servitudes, building restrictions may be imposed in the absence of a dominant estate. See, Comment (d) to La. C.C. art. 775. By definition, a predial servitude is a charge on a servient estate for the benefit of a dominant estate. La. C.C. art. 646. [Emphasis in original.]
Based upon the Civil Code and jurisprudence, we thus conclude that the building restrictions do not confer a predial servitude in favor of the Napolitanos. Therefore, BellSouth did not violate La. R.S. 45:781, and such precludes the necessity of consent by adjacent property owners, expropriation proceedings, or the payment of compensation.
The Napolitanos also argue that the cabinet violates Section XII I of the building restrictions that require that “all services, such as gas, telephone, power, |]fisewers, drains and water pipes shall be place underground from the property line to the building.” This restriction does not apply to Floral Park but from a landowner’s *1192 property line to his home that is, or will be built, on the lot purchased from OLD.
The Napolitanos further contend that nothing may be placed in a park (except Lake-Vista park) “to the detriment, inconvenience or annoyance of the resident or owner of any part or portion of ground or of adjacent property” as reflected in Section XIV of the building restrictions. We find that this does not apply to BellSouth because of La. R.S. 45:781. BellSouth made no such agreement where state-owned land was concerned. We find that OLD could grant a perpetual servitude to BellSouth in Floral Park for the purpose of constructing the cabinet.
The Napolitanos also contend that the transaction between OLD and BellSouth conveying the perpetual servitude was not valid. The resolution in question conveying the servitude is dated 18 January 2006.
Since 1976, BellSouth had a cross box in Floral Park behind 111 Lark Street. The cross box was about four feet tall by about two feet deep (below the ground) by about three to four feet wide. This box, which was copper line fed, was destroyed by the storm. It was decided that all new equipment would use fiber optic cables and be placed some distance above the ground to prevent future damage from flooding. The purpose of the cabinet is to turn the light that is transmitted by the fiber optic lines into electricity that can be used by consumers.
Representatives from OLD and Bell-South testified at trial that it was understood that the new cabinet be placed in approximately the same location as the ruined cross box. This was so that services could be restored to consumers 11fiquicker. While BellSouth referred to the cross box as the “111 Lark cross box,” that did not mean it was on the property of the homeowner; it was a designation so that the technician would know where to go for service calls and maintenance. Approximately between 900-1200 homes are serviced by that unit. It would cost about $500,000.00 to move the unit.
Both OLD and BellSouth agreed that the drawings and the original servitude recorded for that site did not exactly depict where the cabinet was actually placed; 101 Lark Street was listed, not 111 Lark Street. However, it was placed at or near the location of the earlier cross box. An act of correction was later filed in September 2010.
After hearing all the testimony, the trial court stated in its written reasons for judgment:
There was a considerable amount of testimony regarding whether the servitude BellSouth allegedly purchased from the Orleans Levee District was valid. The minutes of the November 9, 2005 Planning, Engineering and Construction Committee Meeting were presented, as well as the minutes of the Board of Commissioners of the Orleans Levee District meeting held on November 16, 2005. It is certainly true that the minutes of the Planning, Engineering and Construction Committee meeting referred to a perpetual servitude at “101 Lark Street” instead of 111 Lark Street. Nonetheless, the Board of Commissioners resolution clearly specifies 111 Lark Street, as does the Act of Correction issued on September 14, 2010.
It was alleged that the Orleans Levee District did not follow its own internal procedures, and therefore the servitude is invalid. The Court found the Orleans Levee District witness to be credible. He testified that the Board was desirous of restoring basic telephone service as quickly as possible in the aftermath of Katrina. The Court declines to find that *1193 the resolution passed by the Board of Commissioners of the Orleans Levee District resolution is improper and has no effect. Furthermore, given the possibility of a typographical error in the minutes of the 117Planning committee meeting, the fact that at least one other drawing shows the servitude to be located at 111 Lark Street, and the fact that the Court finds the testimony that Bell-South wished to place the current control box next to the 1976 control box credible, the Court finds the servitude to be properly located.
After reviewing the testimony given at trial, we cannot say that the trial court was manifestly erroneous in its determinations of credibility or in the conclusions reached. We also find the procedures of OLD to be valid and that the cabinet was placed where the parties intended. We are also cognizant of the suggestions of the court below concerning landscaping around the cabinet in “an aesthetically pleasing manner to provide a better view for nearby landowners.” The court also suggested that a gate be placed around the facility to protect local children playing in the park. We would agree that these are excellent suggestions.
Based on the foregoing, we affirm the judgment of the trial court.[6]

AFFIRMED.

. We use "OLD” herein to mean both the Board of Commissioners of the Orleans Levee District and the Orleans Levee District, any difference being meaningless for the purposes of this opinion.

. We find the proper name of the subdivision to be "Lake-Vista,” although we note that by common usage the subdivision is known as "Lake Vista.”

.At the time the facts of this case occurred, OLD was a political subdivision of Louisiana. As a result of post-Hurricane Katrina legislation, OLD ceased being a political subdivision and became a state agency effective 1 January 2007. The legislation did not change the fact that OLD is the owner of Floral Park; only the management and status of OLD changed.

. Likewise, Floral Park contains a number of transformer vaults (the "vaults”) constructed and maintained by Entergy New Orleans, Inc. ("ENOI”). The vaults, that are approximately 14 feet by 14 feet by 7 feet high, were constructed and installed in Floral Park in the 1940s, before the Lake-Vista Subdivision Building Restrictions were adopted in 1947. The vaults house the equipment required to deliver electrical service to a number of nearby homes in Lake-Vista, using underground lines to connect between the vaults and customers' homes. The purpose of the vaults is to connect electric lines from customer’s homes to ENOI's electric distribution system. ENOI's electric distribution system is an underground service system, although the vaults are located above-ground. All homes in the Lake-Vista Subdivision receive underground electrical services.

. Brier Lake was legislatively overruled by Act 309 of 1999, which amended La. C.C. arts. 776 and 780 (regarding amendments and termination of building restrictions), and 783 (regarding conflicts with the Louisiana Condominium Act, the Louisiana Timesharing Act, and the Louisiana Homeowners Association Act). Act 309 also enacted the Louisiana Homeowners Association Act, La. R.S. 9:1141.1 to 9:1141.9. These changes do not affect the dicta in Brier Lake regarding the differences between predial servitudes and building restrictions.

. To the extent we have not addressed a specific assignment of error made by the Napoli-tanos, we pretermit a discussion thereof because our conclusions hereinabove make a discussion unnecessary.