865 So.2d 863 (2004)
Elka Freeman DIEFENTHAL, Anna Beth Goodman Wife of/and John Goodman, Paul J. Leaman, Jr., Margaret Carolyn Ott Wife of/and Dr. Phillip R. Loria, Max Nathan, Jr., and Carole Crowell Pettit Wife of/and Robert L. Pettit, Jr.
v.
LONGUE VUE FOUNDATION and Longue Vue House and Gardens Corporation.
No. 2002-CA-1470.
Court of Appeal of Louisiana, Fourth Circuit.
January 7, 2004.
*865 Alan H. Goodman, Brent C. Wyatt, Lemle & Kelleher, L.L.P., New Orleans, LA, for Plaintiffs/Appellees.
Phillip A. Wittmann, Wayne J. Lee, Walter F. Wolf, III, Stone Pigman Walther Wittmann L.L.C., New Orleans, LA, for Defendants/Appellants.
Ronald J. Sholes, Ann R. Koppel, Adams and Reese, New Orleans, LA, for Intervenors/Appellees, (The Bamboo Road Residents).
(Court composed of Judge CHARLES R. JONES, Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge DENNIS R. BAGNERIS, SR., Judge EDWIN A. LOMBARD).
PATRICIA RIVET MURRAY, Judge.
This is an action for declaratory and injunctive relief seeking to enforce restrictive covenants prohibiting commercial use of the properties fronting Garden Lane, one of the premiere residential neighborhoods in the City of New Orleans. The owners of the seven residences fronting Garden Lane (the "Residents") filed this action against Longue Vue Foundation and Longue Vue House and Gardens Corporation ("Longue Vue").[1] Longue Vue is the owner of a historic house, museum and gardens situated on several acres on the border of the City of New Orleans and Metairie; its northern boundary is Garden Lane.
This is the third time in the last thirty years that Longue Vue (or its prior owners) has been sued by its Garden Lane *866 neighbors. All three cases have involved attempts to enjoin Longue Vue from expanding the commercial use of its Garden Lane property. The first suit, filed in 1973, was based on alleged violations of a commercial use restriction imposed by a 1931 Act on the Garden Lane properties. That suit was resolved by a 1977 settlement agreement, which relaxed the commercial use restriction, but only as to Longue Vue and only as to certain limited activities (the "1977 Agreement"). The second suit, filed in 1988, was based on alleged violations of the 1977 Agreement. That suit was litigated and was ultimately resolved by the Louisiana Supreme Court's decision in Diefenthal v. Longue Vue Management Corp., 561 So.2d 44 (La. 1990).
In 2000, the Residents filed the instant suit based on alleged violations of the 1931 Act, the 1977 Agreement, and the 1990 Diefenthal decision. In this suit, the Residents seek to enjoin Longue Vue's plans to convert an adjoining, former Garden Lane property (the "Brint Property") into a parking facility; to hold parties and other functions on its site; and to close off a portion of Garden Lane (the "End Strip"). From the trial court's judgment granting the Residents' motion for summary judgment and their request for injunctive relief, Longue Vue appeals. For the reasons that follow, we affirm that judgment. In addition, although the trial court's judgment does not address the intervention filed by the Bamboo Road residents, the record includes a ruling granting the intervention. Longue Vue has appealed that ruling. For the reasons that follow, we reverse that ruling.

FACTUAL AND PROCEDURAL BACKGROUND
In 1922, Longue Vue's prior owners, Edgar and Edith Stern, acquired a 250 by 500 feet lot at the end of Garden Lane from Dr. Charles Eckhardt. At that time, Garden Lane (formerly Metairie Lane) was a through street that ran from Metairie Road to Palmetto Road (formerly North Line Street). That 1922 Act of Cash Sale refers to the reservation of Garden Lane as a common alley for the abutting properties, providing that:
[T]he strip of land 50 feet wide and extending from Metairie Road to North Line Street, shall be forever left open, unobstructed and exclusively used as a common alley or passage way for the use and benefit of the property herein conveyed and the other portions of the larger tract hereinabove described.
On February 16, 1931, Mr. Stern and the other six then owners of the properties fronting Garden Lane entered into an authentic act imposing certain restrictions on their respective properties. The 1931 Act recites that the various properties subject to the restrictions "constitute that certain tract of land heretofore acquired by Dr. Charles Eckhardt from the Succession of Adolph Zennack" on June 24, 1898.
Included among the restrictions imposed by the 1931 Act not only was a commercial use restriction, but also were restrictions on the types of buildings that could be erected, the number of dwellings on each lot, the size of buildings, the size of the lots, and the amount of setback. Also included was a racial alienation restriction, discussed elsewhere in this opinion. Particularly, the pertinent provision of the 1931 Act setting forth the restrictions reads as follows:
[N]o part of the property owned by them and hereinabove described shall ever be sold, used, leased or otherwise permitted to be employed, directly or indirectly, for business or commercial purposes of any description or for anything but private residences and outbuildings *867 appurtenant thereto; that no apartments, duplexes, double houses, tenements or double cottages shall ever be constructed or maintained on any part thereof; that all dwellings erected on any portion of said property shall be single one-family dwellings with their principal front towards Metairie Lane, with or without outbuildings appurtenant thereto; that only one such dwelling shall be located on each lot; that not more than one-third (1/3) of the area of any lot shall be occupied by the ground floor area of the dwelling and outbuildings constructed thereon; that no building shall have a greater height than fifty (50') feet measured from grade line to eaves thereof; that no building, outbuilding or other structure except a fence shall be henceforward located on any lot within fifty (50') feet of the front line of the properties bordering on Metairie Lane; and that no portion of the property above described shall ever be sold, leased or occupied by any other than people of the white race, occupancy by domestic servants excepted; and the appearers further declared that limitations upon the size of the lots into which the properties above described may be subdivided appear in the respective titles of the properties ...
Collectively, the restrictions "constitute[d] a general plan of development and were properly filed, thus giving constructive knowledge of their contents to all prospective purchasers." Diefenthal, 561 So.2d at 51.
Addressing the duration of the restrictions, the 1931 Act provides:
[A]ll the above servitudes, reservations, restrictions, covenants, conditions and real obligations are valid and binding under the law of Louisiana without any limitation of time, but that in the event it should be held that said covenants can only be made under the law of Louisiana for a limited time, then and in that event each of such covenants is to be binding for a period of fifty (50) years from this date.
Describing the nature of the restrictions, the 1931 Act declares:
[T]his agreement shall constitute a servitude upon each and every parcel of property hereinabove described in favor of each and every other piece or portion thereof and shall be a servitude running with the land, binding upon each and every present and future owner thereof, all of whom shall be forever subject to the burdens and forever entitled to the benefits of all and singular the servitudes, reservations, restrictions, covenants, conditions and real obligations herein set forth, and shall have the right to enforce the same by appropriate proceedings at law or in equity to prevent any infringement or attempt to infringe the same and/or to compel the performance and observation thereof and/or the recovery of damages for any infringement or omission thereof, and each and every one of the properties above described and portions thereof shall never be conveyed except subject to the provisions hereof. The personal liability of any owner shall cease upon his bona fide sale, subject to the provisions hereof, of the property owned by him, it being the intent and effect of this instrument that the provisions hereof shall at all times bind the properties above described and the then owners thereof.
The 1931 Act also declares that Garden Lane "is a common alley, never dedicated to public use, appurtenant to all of the properties" abutting it. The Act additionally conveys to Mr. Stern all right, title, and interest the other property owners possessed regarding the portion of Garden Lane that extended between the lot Mr. *868 Stern then owned at the end of Garden Lane and the lot he was about to acquire, and authorized Mr. Stern to close off or to build upon that portion of Garden Lane.
Upon acquiring the lot on the other side of Garden Lane, Mr. Stern, utilizing the above provision, closed in the portion of Garden Lane between the two lots. As a result, Garden Lane was converted into a private, dead end street running from Metairie Lane to Longue Vue's then property line. This is reflected in the 1977 Agreement, which describes Garden Lane as: "[a] certain alley or passageway ... fronting on Metairie Road and measuring, at right angles, 50 feet wide between parallel lines approximately 710 feet, more or less, in length, from Metairie Road to property owned by Mrs. Stern."
In the 1960's, Mrs. Stern decided, despite the 1931 Act's commercial use restriction, to open her residence and surrounding gardens to the public and to convert her residence into a public museum. In 1973, her neighbors responded by filing suit, alleging her attempts to expand the public use of the property violated the 1931 Act.
The parties settled that first suit by entering into the 1977 Agreement, pursuant to which each side gave up something. The neighbors agreed to relax the commercial use restriction of the 1931 Act, but only as to the Longue Vue property and only as to certain uses. Simply stated, the parties agreed that Longue Vue's "gardens may be opened to the public for viewing, the house and other outbuildings may be used for museum purposes within the ordinary meaning of that word, and the Playhouse may be used for meetings, limited to three nights per week, of nonprofit groups." Diefenthal, 561 So.2d at 54. In turn, Mrs. Stern agreed that Garden Lane would remain a private road and that the public generally would not use it for access to Longue Vue; rather, she was required to construct a public entrance for access to Longue Vue. This public entrance was subsequently constructed on Bamboo Road. The 1977 Agreement also provided that a majority of the other property owners could agree to erect a barrier or gatehouse at the Garden Lane entrance and to station a guard there to enforce the terms of the agreement and to share the costs pro rata.
Also in the 1970's, around the time of her husband's death, Mrs. Stern attempted to donate the property to, among others, the New Orleans Museum of Art. This attempted donation was blocked because of a conflict with municipal zoning ordinances. Although the City Council passed an ordinance allowing any residence with four acres to be opened as a museum, Mrs. Stern's efforts to donate the property failed. Diefenthal, 561 So.2d at 47. Consequently, she created and funded Longue Vue to operate the museum. Upon her death in 1980, Longue Vue became the owner of the property.
In 1987, Longue Vue began to host large, loud parties and other functions frequently on the property. In 1988, the neighbors commenced a second suit seeking declaratory and injunctive relief based on Longue Vue's violations of the 1931 Act and 1977 Agreement. In 1990, the second suit was resolved by the Louisiana Supreme Court's decision in Diefenthal.
In Diefenthal, the Court framed the issue as whether Longue Vue, "a museum located adjacent to a residential neighborhood, can allow use of its facility for large, outdoor functions which allegedly violated restrictive covenants governing use of the property." 561 So.2d at 46-47. Holding that it could not, the Court reasoned that "[t]he stately Longue Vue residence may have been transformed into a museum, but it is nevertheless bound by and must recognize *869 the constraints of its location." 561 So.2d at 57. Those constraints were the restrictions set forth in the 1931 Act, as amended by the 1977 Agreement. (For ease of reference, we refer to that bundle of property restrictions in the 1931 Act and 1977 Agreement collectively as the "Restrictions.") Although the Court also stated that the large, outdoor functions created a nuisance, the Court based its decision on Longue Vue's past violations of the Restrictions and reinstated the trial court's judgment interpreting those Restrictions and granting injunctive relief.
Three events have occurred since the Diefenthal decision. It is these three events, which are detailed below, that have prompted the present suit. First, on June 9, 1998, Longue Vue purchased # 14 Garden Lane (the Brint Property), which abutted the property Longue Vue already owned.[2] As a result, Longue Vue became the owner of more than one-half of the Garden Lane property, excluding streets and street rights-of-way, subject to the Restrictions.
The second event occurred in December 1999, when Longue Vue applied to the City of New Orleans for a conditional use permit. This permit would allow Longue Vue's expansion of the property associated with its museum and gardens and its construction of museum-related improvements, including parking facilities. The permit also provided for a re-subdivision, which would allow Longue Vue to incorporate the Brint Property into the existing Longue Vue site. The Master Plan submitted to the City provided for demolishing the Brint residence and constructing a parking lot on part of the property.[3] It further provided for erecting a fence across Garden Lane at the edge of the former Brint Property to prevent Longue Vue visitors from using Garden Lane as a means of ingress or egress, absent an emergency. This small, one hundred feet segment of Garden Lane that Longue Vue proposes to enclose is located in front of the Brint Property and surrounded on all three sides by property now owned by Longue Vue. (This small segment of Garden Lane is referred to in this litigation as the "End Strip.") The Master Plan also provided that Longue Vue would construct a turnaround, for the Residents' use, where Garden Lane meets the End Strip.
After a hearing, the City Planning Commission denied Longue Vue's request, concluding that to grant it "would destabalize and lessen the property values of a beautiful neighborhood" and would lead to "future demolitions in the neighborhood as well as commercial encroachment." Overruling the Commission's decision, the City Council on February 17, 2000 approved Longue Vue's application and passed Ordinance No. 19591, which embodied that approval. On March 28, 2000, former Mayor Marc Morial approved and returned the Ordinance.
The third triggering event occurred on February 17, 2000, when Longue Vue executed an Act of Termination. Because the validity of this Act of Termination is the core issue presented in this case, we quote its key recitals; to wit:
 The Subject Longue Vue Property and other parcels of immovable property owned by other persons ... are the subject of certain restrictions established by an act ... dated December 16, 1931, and registered in ... Orleans Parish, Louisiana, as amended by an *870 act ... dated April 18, 1977, and registered in ... Orleans Parish, Louisiana (collectively, the "Restrictions") (for ease of reference, the Subject Longue Vue Property and the Other Restricted Property are collectively referred to as the "Restricted Property").

 To the extent that they apply, the Restrictions are building restrictions under Louisiana Civil Code articles 775 et seq.

 The Restrictions state that they are "without any limitation of time, but that in the event it should be held then [sic] said covenants can only be made under the law of Louisiana for a limited time, then and in that event each of such covenants is to be binding for a period of fifty (50) years from this date."
 The Restrictions specify no means for termination and have been in effect for at least 15 years.
 Pursuant to Louisiana Civil Code article 780, as owner of more than one-half of the Restricted Property, Longue Vue hereby terminates the Restrictions in their entirety.
The Act of Termination was recorded in the conveyance records on April 24, 2000.
Meanwhile, in April 2000, shortly after the City passed the Ordinance, but prior to the recordation of the Act of Termination, the Residents commenced this suit seeking to enjoin Longue Vue's plan to convert the Brint Property into a parking facility, to hold functions on its property, and to close in the End Strip. The Residents contend that Longue Vue's plans are in violation of the 1931 Act, the 1977 Agreement, and the 1990 Diefenthal decision. After learning of Longue Vue's Act of Termination, the Residents filed an amended petition challenging the Act of Termination and seeking a declaration that it is void and without effect.
To place this rather complex property dispute in context, we briefly outline the Residents' claims as set forth in their original and amending petitions; to wit:
 The 1931 Act creates predial servitudes by its literal terms, and La. C.C. art. 780 does not apply to servitudes. The predial servitudes as they pertain to the Brint Residence (and the Residents alike) in the 1931 Act were not relaxed by the 1977 Settlement, and those servitudes prohibit the use of the Brint Residence for commercial purposes or for any use other than as a private residence. Accordingly, Longue Vue may not use the Brint Residence as a parking lot for a public museum and gardens.
 Even if the 1931 Act could be deemed to create "building restrictions," Article 780 (as it replaces La. R.S. 9:5622) can not be applied retroactively to the 1931 Act to impair the Residents' vested contract and property rights.
 The 1977 Agreement in any event does not contain "building restrictions," and Article 780 does not apply to it, and it cannot be terminated unilaterally by Longue Vue.
 Longue Vue's plans to host parties on its property would violate the 1931 Act, the 1977 Agreement, and the 1990 Diefenthal decision.[4]
 Garden Lane is a private common alley for the benefit of all the Garden Lane Residents, and Longue Vue does not have the right to close off the End Strip and take it for its exclusive use *871 without the consent of all the Garden Lane Residents.
 The closing off of the End Strip for use in connection with a parking lot for the public would directly violate the 1977 Agreement, which specifically provides that the public visiting the museum and gardens may not use any portion of Garden Lane for parking.
 In the event the court agrees with Longue Vue and determines that the 1931 Act has been terminated, then the court should likewise declare that the portion of Garden Lane between the lots owned by Longue Vue be re-opened.
Longue Vue answered alleging that it entered into and recorded the Act of Termination pursuant to La. C.C. art. 780. As a result, Longue Vue asserts that neither the Restrictions in the 1931 Act, as amended by the 1977 Agreement, nor the 1990 Diefenthal decision interpreting those Restrictions are binding on its use of its property.
The Residents and Longue Vue separately filed cross motions for summary judgment and introduced pertinent supporting documents. The trial court held two hearings on the summary judgment motions. At the first hearing, the court noted that the Residents, who asserted a constitutional issue (i.e., that the retroactive application of La. C.C. art. 780, enacted in 1977, to the previously executed and recorded contracts (the 1931 Act and the 1977 Agreement) would divest the parties' vested rights or impair their contractual obligations), had failed to notify the Attorney General's office, as required by La. R.S. 13:4448. Thereafter, the Residents gave the required notice, and the Attorney General's office responded by filing memoranda expressing its position that, as a matter of statutory construction, Article 780 could not be applied to impair the parties' pre-existing contractual rights under the 1931 Act and 1977 Agreement.[5]
At the second hearing, the trial court, over Longue Vue's objection, allowed two Bamboo Road residents to intervene. Following that hearing, the trial court, adopting the Attorney General's position, granted the Residents' motion for summary judgment and denied Longue Vue's cross motion for partial summary judgment.[6] The trial court also entered a preliminary and permanent injunction in favor of the Residents prohibiting Longue Vue "from closing off and taking for its exclusive use any portion of Garden Lane; from using the Brint Residence in violation of the 1931 Act; and for using the End Strip of Garden Lane for public parking in violation of the 1977 Settlement agreement." This appeal followed.

ANALYSIS
We first address the trial court's ruling allowing the Bamboo Road residents to intervene in this suit. Longue Vue contends that the trial court erred in finding that the Bamboo Road residents had standing to intervene. Longue Vue argues that these residents, who were not parties to the 1931 Act, the 1977 Agreement, or the 1990 Diefenthal decision at issue in this suit, are "interlopers."
Interventions are governed by La. C.C.P. art. 1091, which provides that *872 "[a] third person having an interest therein may intervene in a pending action to enforce a right related to or connected with the object of the pending action against one or more of the parties." La. C.C.P. art. 1091. The jurisprudence has construed this provision as imposing a two-pronged requirement for intervention: the party seeking to intervene must have both a justiciable right in, and a connexity to, the principal demand. Leger v. Kent, 2001-2241, 2001-2380, p. 3 (La.App. 4 Cir. 4/24/02), 817 So.2d 305, 307-08. A "justiciable right" is defined as "the right of a party to seek redress or a remedy against either plaintiff or defendant in the original action or both, and where those parties have a real interest in opposing it." Id. (quoting Amoco Production Co. v. Columbia Gas Transmission Corp., 455 So.2d 1260, 1264 (La.App. 4 Cir.1984)). "Connexity" requires the party seeking to intervene establish that the outcome of the suit will have a direct impact on that party's rights. Leger, 2001-2241, 2001-2380 at p. 4, 817 So.2d at 308.
The Bamboo Road residents claim a justiciable interest in this suit because the Garden Lane Residents are seeking to enforce the Diefenthal decision, which found that Longue Vue's hosting large functions constituted a nuisance. The Bamboo Road residents contend that the connexity prong is satisfied because the outcome of this suit will determine if the Diefenthal nuisance finding remains in effect. They argue that this determination will directly impact their right to pursue a nuisance claim and possibly could be res judicata.
The Bamboo Road residents' reliance on the Diefenthal nuisance finding to establish their right to intervene in the instant action is misplaced. Diefenthal centered on interpreting and enforcing the Restrictions; the nuisance holding was simply an additional basis cited in support of the core findings based on the Restrictions. The validity of the Restrictions is at the heart of this suit. Given that the Bamboo Road residents are strangers to those Restrictions, the appropriate role for them in this action is that of amicus curiae. See 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 7.3 (1999)(noting that a nonparty who may be adversely affected by the precedential value of a suit may obtain adequate protection by making an appearance as an amicus curiae). We, therefore, reverse the trial court's finding that the Bamboo Road residents had standing to intervene.
Turning to the merits, we review the trial court's decision granting summary judgment de novo. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, p. 26 (La.7/5/94), 639 So.2d 730, 750. We thus ask the same questions as the trial court; to wit: "whether there is any genuine issue of material fact, and whether the mover-appell[ee] is entitled to judgment as a matter of law." Id. In answering these questions, we are guided by the Legislature's admonition that "[t]he summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action" and that "[t]he procedure is favored and shall be construed to accomplish these ends." La. C. Civ. Pro. art. 966(A)(2).
The parties agree that the instant dispute over the validity of Longue Vue's attempt to terminate the Restrictions is ripe for summary judgment. As noted, both sides filed motions for summary judgment on this issue. Agreeing with the Residents and the Attorney General, the trial court framed the issue presented as whether, as a matter of statutory construction, Article 780, as enacted by La. Acts 1977, No. 180, effective January 1, 1978, could be retroactively applied to the building *873 restrictions created by the 1931 Act, as amended by the 1977 Agreement. Finding it could not, the trial court cited La. Acts 1977, No. 170, § 7, which provides:
The provisions of this Act shall apply to all building restrictions, including those existing on the effective date of this Act; but no provision may be applied to divest already vested rights or to impair the obligation of contracts.
La. Acts 1977, No. 170, § 7.[7] Based on the above provision, the trial court reasoned that to apply Article 780 to the 1931 Act and 1977 Agreement would impair the parties' contractual rights. The trial court thus concluded that Article 780 could not be retroactively applied to terminate the Restrictions, stating:
At the time the contract was confected all parties would have to agree to terminate. Therefore, each had an obligation to continue the contract until all agreed to its termination. Conversely, each had a right to prevent its termination. To apply Article 780 retroactively would be to impair, deny or release parties from their contractual obligations or rights.
The Residents argue that the trial court's decision is correct and that our analysis should end here.
Longue Vue counters that the trial court erred in refusing to find Article 780 applicable and its Act of Termination valid, and offers two arguments in support of its position. First, it argues that the application of Article 780 to the Restrictions is not a retroactive application of the law. In support of this position, Longue Vue cites the following civilian formula for determining when a law is being retroactively applied: "A law is retroactive when it goes back to the past either to evaluate the conditions of the legality of an act, or to modify or suppress the effects of a right that have already been realized. Apart from this there is no retroactivity, and a law may modify the future effects of facts or acts that have preceded it without being retroactive." 4 A.N. Yiannopoulos, Louisiana Civil Law Treatise: Predial Servitudes § 2 (2nd ed.1997). Longue Vue contends that, because the Restrictions did not provide a method for their termination, the parties' contractual rights will not be impaired by if Article 780 is applied to provide for same.
Longue Vue also cites La. C.C. art. 2054, which provides:
When the parties make no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.
La. C.C. art. 2054. It argues that the implied provision here is that set forth by the Legislature in Article 780. Longue Vue stresses that the statutory provision in effect at the time of the 1977 Agreement was executed, former La. R.S. 9:5622 (as amended in 1960), included the same provision now found in Article 780 empowering *874 a majority landowner to terminate property restrictions.
Alternatively, citing Johnston v. Frantom, 159 So.2d 404 (La.App. 2 Cir.1963), Longue Vue argues that retroactive application of Article 780 to the Restrictions is permissible. In Johnston, the court upheld the constitutionality of retroactively applying the 1960 amendment to former La. R.S. 9:5622 (the predecessor to Article 780) to allow the majority owners of existing building restrictions created before that amendment to terminate them. In so doing, the court reasoned that the statute was "not unreasonable, arbitrary or capricious, and accordingly, the judgment and action of the Legislature cannot be supervened by court decree." Johnston, 159 So.2d at 404-05.[8]
Although retroactive application of Article 780 (or its predecessor, La. R.S. 9:5622) to the Restrictions, which were enacted in 1931, and amended in 1977, raises a constitutional issue, we find it unnecessary to resolve that issue in order to decide this case. Rather, we adhere to the jurisprudential rule that "[c]ourts should avoid constitutional rulings when the case can be disposed of on non-constitutional grounds." Ring v. State, Dep't of Transp. and Dev., XXXX-XXXX, p. 5 (La.1/14/03), 835 So.2d 423, 427. Stated otherwise, "courts should refrain from reaching or determining the constitutionality of legislation unless, in the context of a particular case, the resolution of this is essential to the decision of the case or controversy." Cat's Meow, Inc. v. City of New Orleans Through Dep't of Finance, 1998-601, pp. 16-17 (La.10/20/98), 720 So.2d 1186, 1199. Resolution of the retroactivity issue is not essential to the decision of this case. Even assuming Article 780 applies, the Act of Termination is invalid.
Reviewing the trial court's ruling on summary judgment de novo, we find that the validity of the Act of Termination hinges on an analysis of two of the recitals in the Act of Termination; namely:
 The Restrictions are building restrictions under Louisiana Civil Code articles 775 et seq. (the "Classification issue").
 The Restrictions specify no means for termination and have been in effect for at least 15 years (the "Termination Provision issue").
The Classification issue poses the question whether the Restrictions are building restrictions, as Longue Vue contends, or predial servitudes, as the Residents contend. If the Restrictions are predial servitudes, the concurrence of all the property owners is required to terminate them. Whereas, if they are building restrictions, then Article 780 may apply to allow a majority landowner to terminate them.
The Termination Provision issue poses the question whether the provision in the 1931 Act addressing the duration of the Restrictions constitutes a contractual termination provision under Article 780 (and its predecessor La. R.S. 9:5622). We separately address these two issues.

BUILDING RESTRICTIONS VERSUS PREDIAL SERVITUDES
To place the classification issue in context, we first outline the historical development and nature of building restrictions. As the term implies, building restrictions are limits imposed on the uses to which an *875 owner can put his property. Building restrictions are "the most important category of restraints on the use or disposition of immovables from the viewpoints of urban and suburban developments in Louisiana," La. C.C. art. 775, comment (d). The jurisprudence developed building restrictions to fill the gap created by the inadequacy of the Civil Code articles on predial servitudes and the local zoning ordinances to meet the needs of landowners to plan and control the development of subdivisions. Allen Scott Crigler, Comment, Some Observations on Building Restrictions, 41 La. L.Rev. 1201, 1202 (1981) ("Crigler")
Before 1977, building restrictions were a creature of the jurisprudence; the Civil Code did not specifically address them. Brier Lake, Inc. v. Jones, 1997-2413, p. 6 (La.4/14/98), 710 So.2d 1054, 1057.[9] In 1977, the Legislature enacted La. C.C. arts. 775 through 783, regarding building restrictions. La. Acts 1977, No. 170 (effective January 1, 1978). Article 775 defines building restrictions as "charges imposed by the owner of an immovable in pursuance of a general plan governing building standards, specified uses, and improvements. The plan must be feasible and capable of being preserved." La. C.C. art. 775. The requirements of an ancestor in title and a general plan of development are essential features of building restrictions. C.C. art. 775, comment (d).[10]
The 1977 revision characterized building restrictions as "sui generis real rights akin to predial servitudes." Lakeshore Property Owners Ass'n, Inc. v. Delatte, 579 So.2d 1039, 1041 (La.App. 4 Cir.1991); see also La. C.C. art. 777 (classifying building restrictions as "incorporeal immovables and real rights likened to predial servitudes"). Building restrictions are regulated by La. C.C. arts. 775 through 783 as well as by "the rules governing predial servitudes to the extent that their application is compatible with the nature of building restrictions." La. C.C. art. 777.
Building restrictions create a real right, which is the right of the property owners to bring enforcement actions to prohibit any use of the property that does not comport with the general plan of development. Crigler, supra at 1203. The property owners may enforce building restrictions by "mandatory and prohibitory injunctions without regard to the limitations of Article 3601 of the Code of Civil Procedure." La. C.C. art. 779.
Although building restrictions and predial servitudes are alike in that they both create real rights, these two concepts are different in at least three respects; to wit: (i) building restrictions may be imposed in *876 the absence of a dominant estate, predial servitudes may not; (ii) building restrictions may impose affirmative duties that are reasonable and necessary for the maintenance of the general plan, predial servitudes may not; and (iii) building restrictions may exclude performance of certain juridical acts, predial servitudes may not. Patrick Johnson, Jr., Comment, The Civil Code Articles on Building Restrictions: A Critical Analysis, 53 Tul. L.Rev. 583, 590 (1979).
Since the rules governing building restrictions are different from those governing predial servitudes, a classification issue is presented as to the precise nature of the rights created when restrictions are imposed by agreement among all the landowners. See La. C.C. art. 776 (providing that a building restriction may be imposed either by the owner of an immovablei.e., the original developerbefore the property is subdivided, or by all the owners of the affected immovable after the property is subdivided). The resolution of the classification issue "is a matter of contractual interpretation, resolved in the light of the facts of each case and in accordance with the intention of the parties." La. C.C. art. 776, Comment (b). When there is any doubt as to the existence, validity, or extent of building restrictions, Article 783 requires that the matter be resolved in favor of unrestricted use of the immovable.
The Civil Code also recognizes that, over time, the property owners may need to modify or terminate building restrictions that no longer comport with the changed circumstances in the neighborhood. To address this need, the Code provides three methods for terminating building restriction: (1) by agreement of the property owners under Article 780, (2) by abandonment under Article 782, and (3) by two-year liberative prescription under Article 781. Crigler, supra at 1204. Any one of these methods can be used to extinguish either a part or all of the restrictive plan. Id.
As noted, this case involves an attempt to invoke the first method: termination by agreement of the property owners pursuant to Article 780. That method is further subdivided into two modes of termination: (1) termination according to terms prescribed in the act that created them, and (2) termination under rules enacted by special legislation. A.N. Yiannopoulos, Real Rights: Limits of Contractual and Testamentary Freedom, 30 La. L.Rev. 44, 69 (1969). The special legislation is the provision for termination by the majority of the property owners after fifteen years.[11]
"Zoning ordinances neither terminate nor supersede existing building restrictions." La. C.C. art. 782, Comment (c). However, the converse is not necessary true. "Zoning ordinances affecting previously unrestricted areas involve a valid exercise of police power and exclude the freedom of landowners to establish building restrictions that are incompatible with the public acts." Id.
To resolve the classification issue presented in the instant case, we find it appropriate to analyze separately the three relevant documents involved; those documents are: (i) the 1931 Act, (ii) the 1977 Agreement, and (iii) the 1990 Diefenthal decision.

(i) 1931 Act
Both sides quote the terminology used in the 1931 Act to describe the restrictive *877 covenants as supporting their respective positions regarding the classification of the Restrictions. The Residents stress the use of the word "servitude" as evidencing the parties' intent to create predial servitudes. Longue Vue counters that the use of the word servitude is not dispositive. In support, it emphasizes that in the 1998 Brier Lake decision, the building restrictions at issue were referred to as "servitudes, privileges and restrictions." Longue Vue further emphasizes the lack of the term "predial servitude" in the 1931 Act despite the fact that term was found in the 1870 Civil Code. Longue Vue further still emphasizes that the 1931 Act refers to the restrictive covenants not only as servitudes, but also as "reservations, restrictions, covenants, conditions and real obligations," and as "servitude[s] running with the land." That terminology, Longue Vue stresses, corresponds with the pre-1977 jurisprudential treatment of building restrictions. We agree.
Viewed in historical perspective, the overall terminology the parties used in the 1931 Act reflects that they intended to establish building restrictions. It corresponds with the three theories the pre-1977 jurisprudence used to describe the concept now referred to as building restrictions. Despite the statement in the 1977 revision comments that the Legislature was simply codifying the existing jurisprudence, "the jurisprudence prior to 1977 had inconsistently treated building restrictions as predial servitudes, real obligations accompanying land into the hands of the vendee, or covenants running with the land." Brier Lake, 1997-2413 at p. 7, 710 So.2d at 1057 (collecting cases); see also Eugene G. Taggart, Comment, "Equitable Restrictions" in Louisiana, 33 Tul. L.Rev. 822, 824 (1959)(noting that the early jurisprudence viewed such property restrictions in one of three different ways: (i) as a predial servitude; (ii) as a real obligation other than a servitude; and (iii) as something comparable to the common law doctrine of equitable restrictions).
Another argument the Residents assert in support of their position that the Restrictions are predial servitudes is that the restrictive covenants imposed in the 1931 Act have been specifically declared by the Civil Code to be classic examples of servitudes. The primary example the Residents cite is La. C.C. art. 706, which expressly sanctions the commercial use limitation imposed by the restrictive covenants. Article 706 provides that negative servitudes are "those that impose on the owner of the servient estate the duty to abstain from doing something on his estate" and include "the servitudes of prohibition of building and of the use of an estate as a commercial or industrial establishment." La. C.C. art. 706.
These examples, cited by the Residents, merely illustrate the inherent apparent overlap between the concepts of predial servitudes and building restrictions. In those situations where such an overlap is present, the comments to the Civil Code articles instruct, as noted above, that the issue of the nature of the right is a matter of contractual construction to be resolved based on the facts of each case and the parties' intentions. La. C.C. art. 776, Comment (b). "Agreements among landowners imposing restrictions on their property in the framework of subdivision planning constitute building restrictions, i.e., sui generis real rights, rather than predial servitudes." Id.
The Louisiana Supreme Court in Diefenthal rejected the argument that the bundle of restrictions created by the 1931 Act, and modified by the 1977 Agreement, did not constitute a general plan. In so doing, the Court stated that "[t]he 1931 agreement not only barred commercial use of Garden *878 Lane property but also restricted lot sizes as well as building size, type, and location." Diefenthal, 561 So.2d at 51 n. 6. Continuing, the Court concluded that "the restrictions on usages of the properties constitute a general plan of development." 561 So.2d at 51. Hence, the 1931 Act constitutes an agreement among landowners imposing restrictions on their property in the framework of subdivision planning, which are building restrictions.
Another reason why the 1931 Act cannot be viewed as creating a predial servitude is that it imposed a racial alienation restriction; namely, it provides that "no portion of the property above described shall ever be sold, leased or occupied by any other than people of the white race, occupancy by domestic servants excepted." Although the parties agree that the racial alienation restriction is unquestionably unconstitutional and unenforceable, its inclusion in the 1931 Act nonetheless establishes that the parties did not intend to impose predial servitudes.
A predial servitude cannot be used to "exclude the performance of juridical acts affecting the servient estate; thus, a prohibition of alienation or partition may not form the content of a predial servitude." La. C.C. art. 651, comment (f); see also La. C.C. art. 651 (providing that "[t]he owner of the servient estate is not required to do anything"). Yet, in the subdivision context, certain restrictions on alienability of property may constitute "valid sui generis real rights in the nature of building restrictions." La. C.C. art. 651, comment (f)(citing Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 So. 641 (1915), the seminal building restrictions case, which involved a similar racial alienation restriction). It follows then that the Restrictions imposed by the 1931 Act could not be predial servitudes, but could be valid real rights in the nature of building restrictions. Overall, we find the 1931 Act reflects the parties' intent to create building restrictions.

(ii) the 1977 Agreement
The Residents argue that the 1977 Agreement is a settlement agreement and that it cannot be viewed as a building restriction. This argument, however, fails to recognize that a settlement agreement creates only a personal, contractual obligation between the parties to that agreement. See La. C.C. art. 3071 (defining a compromise agreement as a contract between two or more persons to adjust their differences by mutual consent). In contrast, building restrictions create real rights, which are binding on successors and assigns. Significantly, we note the absence of any language in the 1977 Agreement to the effect that it binds the successors and heirs of the parties to that agreement. To the extent the recordation of the 1977 Agreement bound the successors and assigns of the parties thereto, it was because of its nature as creating a real right. Of course, the classification issue is again presented since we must determine the nature of that real right.
Like the 1931 Act, the terminology used in the 1977 Agreement, when viewed in historical context, establishes the parties' intent to create building restrictions. First, the 1977 Agreement does not use the terms servitude or predial servitude. Instead, it refers to the restrictive covenants as "restrictions against use" and as "undertakings, covenants and restrictions." That terminology, as Longue Vue points out, is similar to former La. R.S. 9:5622, which was in effect when the 1977 Agreement was executed.[12] Moreover, the 1977 *879 Agreement states that the failure to enforce any one of the covenants "shall not effect abandonment of the entire plan provided in the [1931] Act." This reference to an abandonment of a restrictive plan is applicable only to building restrictions, not predial servitudes. See La. C.C. art. 782.
The classification of the Restrictions as building restrictions is further bolstered by the inclusion in the 1977 act of an affirmative duty; particularly, it authorizes the majority owners of the other property, besides Longue Vue, to agree to erect a barrier or gatehouse at the entrance to Garden Lane and to station a guard there to enforce the terms of the agreement and to share pro rata the costs. See Brier Lake, 1997-2413 at p. 7, 710 So.2d at 1057 (citing the obligation to pay assessments as a classic example of an affirmative duty commonly imposed by building restrictions).
Although building restrictions may impose affirmative duties that are reasonable and necessary for the maintenance of the general plan, predial servitudes may not impose such duties. See La. C.C. arts. 778 and 651. This type of affirmative duty is one of the most effective tools offered by the building restrictions provisions that is not generally available under the predial servitudes provisions. Crigler, supra at 1207. Hence, like the 1931 Act, the provisions of the 1977 Agreement establish an intent to create building restrictions.

(iii) the 2000 Diefenthal decision
Although the Louisiana Supreme Court in the Diefenthal decision declined to classify the Restrictions, it engaged in a detailed analysis of the Restrictions as if they were building restrictions. As noted above, the Court in its discussion found the Restrictions constitute a "general plan of development." In so doing, the Court recited the following basic principles:
The law is clear that building restriction clauses constitute real rights, not personal to the vendor, and inure to the benefit of all other grantees under a general plan of development, and are real rights running with the land; and that the remedy of the other grantees to prevent a violation of the restrictions by another is by injunction. Edwards v. Wiseman, 198 La. 382, 3 So.2d 661, 663 (1941). In this case, the restrictions on usages of the properties constitute a general plan of development and were properly filed, thus giving constructive knowledge of their contents to all prospective purchasers.
Diefenthal, 561 So.2d at 51. Continuing, the Court added:
The law concerning building restrictions is presently codified at C.C. art. 775 to 783. According to the official comments, these 1977 code articles did not change the prior law. The 1931 agreement not only barred commercial use of Garden Lane property but also restricted lot sizes as well as building size, type, and location. Even though that agreement was binding for a term of 50 years, its terms were renewed by incorporation into the 1977 agreement.

561 So.2d at 51 n. 6 (emphasis supplied).[13]
Finally, the Court analyzed the issue of whether the Restrictions were prescribed under La. C.C. art. 781 or abandoned under La. C.C. art. 782. Finding the Restrictions had not terminated by prescription or abandonment, the Court expressly found it unnecessary to rule on whether *880 the Restrictions were predial servitudes. In so doing, however, the Court dropped the following footnote:
Building restrictions are incorporeal immovables and real rights likened to predial servitudes. They are regulated by application of the rules governing predial servitudes to the extent that their application is compatible with the nature of building restrictions. C.C. art. 777. As comment (d) to that article observes, "The matter of classification of building restrictions has given rise to analytical difficulties in Louisiana." We find it doubtful, however, that these covenants would be classified as servitudes: "Man's activities are not the subject of predial servitudes, for it is an estate and not man which is subservient to a servitude."
561 So.2d at 54, n. 9. Although dicta, this extensive discussion of building restrictions supports the conclusion that the Restrictions are building restrictions.
Summarizing, we conclude based on the above analysis of the three pertinent documentsthe two contractual agreements, the 1931 Act and the 1977 Agreement, and the 1990 Diefenthal decision interpreting those agreementsthat the parties intended to create building restrictions. We thus classify the Restrictions as building restrictions.[14]

LEGISLATIVE HISTORY OF ARTICLE 780
Analysis of the Termination Provision issue requires that we trace the legislative history of Article 780. In 1960, the Legislature amended La. R.S. 9:5622 to add a provision similar to that presently found in Article 780. Particularly, the provision authorized owners of a majority of the property to terminate restrictions that had been in effect for at least fifteen years when the agreement creating such restrictions made no provision for terminating them; it provided:
Stipulations in deeds and title to land providing for building restrictions which are inserted in pursuance of a general subdivision plan devised by a common ancestor in title to establish certain use and building standards, constituting covenants running with the land, and wherein no provision is made for terminating the effective date of said restrictions, may be terminated in the following manner:
(1) By agreement of owners of a majority of the square footage of land in said subdivision to terminate and end said restrictive covenants as of a definite date, provided said agreement will not be effective unless said restrictive covenants will have been established a minimum of 15 years prior to the date of termination of said restrictive covenants; and
(2) Any agreement purporting to comply with this statute shall be recorded in the conveyance and mortgage records of the Parish in which the land is located.
La. R.S. 9:5622(A)(as amended by La Acts 1960, No. 448).
In 1977, as part of the legislative codification of building restrictions, the Legislature moved this provision to La. C.C. art. 780; it provided:

*881 Building restrictions terminate as provided in the act that establishes them. In the absence of such provision, owners representing more than one-half of the land area affected by the restrictions may terminate by agreement, for the whole or a part of the restricted area, building restrictions that have been in effect for at least fifteen years.
La. C.C. art. 780 (as enacted by La. Acts 1977, No. 170). The comments to this article state that "[t]his provision reproduces the substance of La. R.S. 9:5622. It does not change the law." La. C.C. art. 780, comment (a). The comments further provide that "[b]uilding restrictions may terminate according to terms prescribed in the act that created them, under rules enacted by special legislation (R.S. 9:5622 as amended), or under rules adopted by the jurisprudence." La. C.C. art. 780, comment (b). Still further, the comments state:
Persons imposing building restrictions may, in the exercise of their freedom of will, prescribe rules for termination, provided, of course, that these rules imply nothing contrary to public order. Thus, provision may be made for termination of the restrictions upon the lapse of a period of time or upon the happening of an event.
Id. (citing Bruce v. Simonson Investments, Inc., 251 La. 893, 207 So.2d 360 (1968)).
In 1980, the Legislature amended Article 780 by adding the highlighted language:
Building restrictions terminate as provided in the act that establishes them. In the absence of such provision, owners representing more than one-half of the land area, excluding streets and their rights-of-way, affected by the restrictions may amend or terminate by agreement, for the whole or a part of the restricted area, building restrictions that have been in effect for at least fifteen years.
La. C.C. art. 780 (as amended by La. Acts 1980, No. 310).
In 1983, the Legislature again amended Article 780, rewriting it to provide:
Building restrictions terminate as provided in the act that establishes them. In the absence of such provision building restrictions may be amended or terminated for the whole or a part of the restricted area by agreement of owners representing more than one-half of the land area affected by the restrictions, excluding streets and street rights-of-way, if the restrictions have been in effect for at least fifteen years, or by agreement of both owners representing two-thirds of the land area affected and two-thirds of the owners of the land affected by the restrictions, excluding streets and street rights-of-way, if the restrictions have been in effect for more than ten years.
La. C.C. art. 780 (as amended by La. Acts 1983, No. 129).
Subsequently, the Louisiana Supreme Court in Brier Lake, Inc. v. Jones, 1997-2413 (La.4/14/98), 710 So.2d 1054, construed the provisions in Article 780 as authorizing only amendments that lessen the restrictions on property. In 1999, the Legislature responded by revamping Article 780; that amendment expressly states that "[t]he provisions of this Act legislatively overrule the case of Brier Lake, Inc. v. Jones, 97-C-2413 (La.4/14/98); 710 So.2d 1054, are remedial, and shall apply both prospectively and retroactively." La. Acts 1999, No. 309. The parties agree that the latter amendment is not relevant to the instant dispute involving an attempt to terminate building restrictions.
With that legislative background in mind, we turn to the issue of whether the *882 provision in the 1931 Act addressing the duration of the Restrictions constitutes a form of contractual termination provision under Article 780 (and its predecessor La. R.S. 9:5622). As quoted above, the 1931 Act addresses the duration of the restrictions by providing as follows:
[A]ll the above servitudes, reservations, restrictions, covenants, conditions and real obligations are valid and binding under the law of Louisiana without any limitation of time, but that in the event it should be held that said covenants can only be made under the law of Louisiana for a limited time, then and in that event each of such covenants is to be binding for a period of fifty (50) years from this date.
In the Diefenthal decision, the Supreme Court addressed the impact of the above provision, apparently under Article 780, stating that "[e]ven though that [1931] agreement was binding for a term of 50 years, its terms were renewed by incorporation into the 1977 agreement." 561 So.2d at 51 n. 6. The Residents translate the Court's statement to mean that the 1977 Agreement incorporated the 1931 Act and that the fifty-year term in the 1931 Act commenced anew in 1977, extending the term of the Restrictions until 2027. On the other hand, Longue Vue contends that this argument overlooks the fact that the fixed duration provision of the 1931 Act only applies if there is a finding that the agreement cannot have an unlimited duration. Continuing, it contends that since no such finding has ever been made, the fifty-year fall-back provision has never become operable and is therefore irrelevant. We disagree.
Although there has been no express determination that building restrictions cannot be binding in perpetuity, the Supreme Court's statement in Diefenthal implicitly found the provision for unlimited duration was invalid and the fifty-year provision was operable. Moreover, the early jurisprudence on building restrictions recognized the invalidity of perpetual restrictions on the use of property; under that jurisprudence the view was that "whereas absolute or perpetual restraints on the alienation or use of immovable property are invalid, reasonable restraints of limited duration imposed by persons having a substantial interest are valid and enforceable against any acquirer of the land with notice." Acts 1977, No. 170, Expose des Motifs, Title V: Building Restrictions (citing Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 So. 641 (1915)).
The Legislature implicitly recognized that building restrictions could not be binding in perpetuity by amending La. R.S. 9:5622 in 1960 to provide for termination by the majority owners after fifteen years. Likewise, the above legislative history of Article 780 evidences the Legislature's intent that building restrictions be subject to some type of contractual limitation on their term. If the parties fail to provide some contractual mode of termination, the Legislature has provided one for them in Article 780 (and its predecessor La. R.S. 9:5622). In so doing, however, the Legislature has recognized the freedom of parties to contractually agree and has made the special legislative provision applicable only if the act that established the restrictions failed to provide a mode of termination.
One such mode of termination that the parties may contractually agree upon is a provision for termination "upon the lapse of a period of time or upon the happening of an event." La. C.C. art. 780, comment (b). Recognizing the validity of such provisions, the jurisprudence has held that when the parties contractually agree to a fixed term, "the statute [is] inapplicable *883 because provision is made in the covenants for terminating the effective date of the restriction. A termination date is not necessary." Robinson v. Morris, 272 So.2d 444, 447 (La.App. 2 Cir. 1973). The Residents contend that the 1931 Act's fifty-year provision is such a contractual provision. They contend that "[t]he 1931 agreement meets this requirement by providing that if the covenants cannot be valid `without any limitation of time,' then they will be binding for at least 50 years." They further contend that "when the 1931 agreement was `renewed' by incorporation into the 1977 settlement, the 50-year period in the 1931 agreement was also `renewed' by the 1977 settlement, and the covenants in the 1931 agreement thus remain binding upon Longue Vue until at least 2027." We find that argument persuasive.
Because building restrictions constitute real rights on property, the only way in which the Restrictions can be amended before the expiration of the fixed term is with the consent of all the landowners. See Simonson Investments, 251 La. at 900, 207 So.2d at 363 (noting that building restrictions are a species of predial servitude and that normally "all owners of lots to which the servitude is due must give consent to achieve a full discharge of the servitude"); see also Mackey v. Armstrong, 97-30054 (La.App. 2 Cir. 12/30/97), 705 So.2d 1198.
Concluding, we hold that Longue Vue's Act of Termination is invalid. We further hold that the Restrictions may not be terminated without the consent of all the landowners until April 18, 2027, fifty-years from the date of the 1977 Agreement. Having so held, the separate issue of Longue Vue's entitlement to close off the End Strip is now moot.

DECREE
For the foregoing reasons, we reverse the trial court's ruling that granted the Bamboo Road residents' motion to intervene and affirm the judgment of the trial court granting summary judgment in favor of the owners of the seven residences fronting Garden Lane.
REVERSED IN PART; AFFIRMED IN PART.
MCKAY, J., concurs in the result.
MCKAY, J., concurs in the result.
I concur with the majority's decision to affirm the judgment of the trial court. However, I am not in agreement with the majority's reasoning regarding building restrictions vis-à-vis servitudes.
First of all, I do not believe it was necessary that the majority address the issue of whether the 1931 agreement constitutes building restrictions or servitudes. The issue was not addressed in Judge Magee's judgment, nor did the Supreme Court address it in Diefenthal v. Longue Vue Management Corp., 561 So.2d 44 (La. 1990).
That being said, in my opinion, the 1931 agreement creates a servitude and not merely building restrictions. The 1931 agreement clearly states that "this agreement shall constitute a servitude upon each and every parcel of property hereinabove described in favor of each and every other piece or portion thereof and shall be a servitude running with the land, binding upon each and every present and future owner thereof." There are three basic requirements for servitudes. First, there must be two estates involved. Second, the estates must be owned by separate owners. Finally, there must be a charge on one estate for the benefit of the other. See La. C.C. art. 646. The covenants in *884 the 1931 agreement meet all of the requirements for servitudes.
NOTES
[1] Longue Vue Foundation is the owner of the property; Longue Vue House and Gardens Corporation is the entity that provides the day-to-day management of the property.
[2] In that act of sale, express reference is made to the Restrictions set forth in the recorded 1931 Act and 1977 Agreement.
[3] The record reflects that during the pendency of the present litigation Longue Vue demolished the Brint residence.
[4] The basis for this claim is a brochure advertising Longue Vue's availability for hosting large parties and functions.
[5] The Attorney General's office did not make an appearance.
[6] Longue Vue filed a partial motion because it believed it was not entitled to summary judgment on its claim to use the End Strip. The trial court's judgment in favor of the Residents includes the End Strip issue. At oral argument before this court, Longue Vue's counsel conceded that the End Strip issue is properly before us.
[7] We note that the prohibition in La. Acts 1977, No. 170, § 7 is simply an express statement of the well-settled constitutional limitations on retroactive application of new laws. 4 A.N. Yiannopoulos, Louisiana Civil Law Treatise: Predial Servitudes § 2 (2nd ed.1997) (noting that "[r]etroactive application of a new law is constitutionally permissible only if it does not result in impairment of the obligation of contracts or in divestiture of vested rights.") The Legislature's intent in including this statement in this Act was simply to provide that newly codified rules regarding building restrictions, including Article 780, be given "the widest possible application that is constitutionally permissible." Id. Indeed, a similar statement is also found in several other legislative enactments, including the Mineral Code. Id.
[8] Although Johnston involved the 1960 amendment to La. R.S. 9:5622, which did not include the prohibition found in La. Acts 1977, No. 170, § 7 against divesting vested rights and impairing contractual obligations, that prohibition is implicitly imposed on all Legislative enactments. See Yiannopoulos, supra.
[9] Before 1977, building restrictions were regulated by La. R.S. 9:5622, which was originally enacted in 1938 and amended in 1960 to add a provision similar to La.C.C. art. 780 regarding termination by the majority owner after the restrictions have been in effect for at least fifteen years. We summarized the legislative history of La. R.S. 9:5622 from its enactment in 1938 through its repeal and replacement by La. Acts 1977, No. 170, effective January 1, 1978, in Lakeshore Property Owners Ass'n, Inc. v. Delatte, 579 So.2d 1039, 1042 n. 5 (La.App. 4 Cir.1991). For purposes of this case, the only pertinent provision of former La. R.S. 9:5622 is that after 1960, it provided for the termination of building restrictions that had been in effect for fifteen years. That same provision was then relocated to the Civil Code by the 1977 Act. The legislative history of Article 780 is discussed in detail elsewhere in this opinion.
[10] We note that these two requirements are not at issue. First, the parties to the 1931 Act were the predecessors in title to the Residents and to Longue Vue, and they all shared a common ancestor in title, Dr. Eckhardt. Second, the Supreme Court has determined that the restrictions on usages of the properties set forth in the 1931 Act "constitute a general plan of development." Diefenthal, 561 So.2d at 51.
[11] That mode of termination was first enacted by the 1960 amendments to La. R.S. 9:5622 and the relocated in 1977 in Article 780.
[12] As noted elsewhere, La. R.S. 9:5622 was repealed by the Legislature when it codified the concept of building restrictions in La. Acts 1977, No. 170.
[13] As discussed elsewhere in this opinion, the emphasized language is an apparent reference to Article 780.
[14] The Residents also argue that regardless of whether the Restrictions are building restrictions Longue Vue cannot terminate the res judicata effect of the Diefenthal decision. Longue Vue counters that the conditions that existed at the time the Diefenthal decision was rendered have changed, citing the three pertinent events, noted above, that have occurred since that decision. As a result, Longue Vue argues that res judicata is inapposite. We agree.